Karen E. Ford Esq.
SW Ocean Ave & Mission, Suite 208
P.O. Box 287
Carmel-by-the-Sea, California 93921-0287
831-250-6433
Fax 831-250-6844
karen@fordslaw.com
SBN 88358
Attorney for Plaintiff Peter Siegel

# United States District Court
# Northern District of California

| | |
|---|---|
| Peter Siegel,<br><br>            Plaintiff,<br><br>    vs.<br><br>Hewlett-Packard Company,<br><br>            Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No: 5:12-cv-03787 HRL_____<br><br>**MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGEMENT FILED BY DEFENDANT HEWLETT PACKARD** |

_____

Plaintiff Peter Siegel (Plaintiff or Siegel) hereby submits his initial opposition to the Motion for Summary Judgment (MSJ) filed by Defendant Hewlett Packard Company (HP). Plaintiff asserts that the MSJ must be denied as premature pursuant to Rule 56(d) of the Federal Rules of Civil Procedure because, despite diligent effort on his part, he has not yet had the opportunity to conduct necessary discovery. Plaintiff further opposes the MSJ on the grounds that 1) the undisputed evidence supports Plaintiff's legal position and 2) that there is evidence establishing disputes of fact as to the factual contentions raised by Defendant HP and 3) that the evidence presented by Plaintiff supports an order in favor of Plaintiff on the issues presented and 4) that HP has misstated the applicable legal standards. Plaintiff relies on the Declarations of Karen E. Ford (Ford Declaration) and Peter Siegel (Siegel Declaration) filed herewith; the Request for Judicial Notice filed herewith, the Motion to Strike filed herewith; the Complaint filed in this action and the record in this action as a whole.

## I.      The MSJ Should Be Denied Due to the Need for Further Discovery.

As set out in the Motion for Continuance with regard to the MSJ filed in this action on or about July 11, 2013 the declaration of Karen E. Ford in support of the Motion to Continue and the Ford Declaration filed herewith, Plaintiff is unable to respond fully to the MSJ because he has yet to complete discovery. It is anticipated that much of the information provided in opposition to the MSJ will be the subject of objection on such grounds as lack of foundation or speculation. However, if Plaintiff were permitted to complete discovery such problems could be cured. Plaintiff submits that he sought diligently to obtain the necessary discovery but it was not forthcoming from HP. For the reasons set forth herein and in the Motion to Continue the MSJ, Plaintiff requests that the MSJ be denied or continued until discovery can be completed pursuant to Rule 56(d) of the Federal Rules of Civil Procedure.

## II.      Background

It is undisputed that Siegel is a citizen of the US who was employed in the United Kingdom (UK) by HP and assigned to a wholly owned subsidiary of HP.  Prior to 2008 Siegel

was employed in the UK by a different US corporation, EDS, based in Plano, Texas.[1]  In 2008 EDS was acquired by HP and was merged into the HP organization. In March of 2009 Plaintiff was in a traffic accident in which he suffered a permanent brain injury rendering him disabled. Plaintiff contends that he was thereafter discriminated against and subjected to a hostile work environment in violation of the Americans with Disabilities Act as a result of his disability or because he was regarded as more disabled that he was. He also contends that his employer, in further violation of the ADA failed and refused to accommodate his disability and failed or refused to engage in an interactive process concerning his requests for accommodation. The sole issue presented by the MSJ at issue is whether the ADA applied to Plaintiff's employment in the UK. He left HP in March 2011.

**The HP Global Organization**

A key to understanding the flaws in the arguments raised by HP is an understanding of the nature of the HP global organization. The MSJ contrasts HP operations in the US and HP operations in the UK as if there were a division between the two and as if the UK operation were limited to HP Enterprise Services UK Ltd.[2] The evidence, including countless admissions by HP, indicates this is inaccurate. The evidence establishes that HP holds itself out and, in fact, operates, as a single integrated global enterprise which includes numerous business entities. The MSJ relies on references to Enterprise Services in HP's own evidence as if that refers exclusively to HP Enterprise Services Limited UK and no other entity. The MSJ also contrasts HP operations in the US and HP operations in the UK as if there were a division between the two and as if the UK operation was limited to HP Enterprise Services UK. This is undeniably inaccurate. The HP organization includes at least six to eight entities in the UK. The defendant in this case is an integrated international business and the details of the every changing merry go round of subsidiary entities it creates to suit its whim should not preclude liability in this case.

---

[1]  Prior to the merger with HP the UK subsidiary was owned and controlled by the parent company, Electronic Data Systems (EDS), in Plano, Texas.  Thus, application of the ADA to Plaintiff's employment did not begin with the merger with HP. He was always a US citizen employed abroad by a US company through a wholly owned and controlled subsidiary.
[2]  Thus, HP presents evidence from employees of another of the entities in the global organization, HP Limited, in support of the MSJ.

### III.    Summary of Pertinent Facts and Evidence

#### A.  Response to Undisputed Facts Relied on by HP

HP sets out the allegedly undisputed facts on which the Motion is based on pages 1 through 3 of its Motion. HP may not base its motion on factual allegations which are unsupported by evidence or as to which Plaintiff has produced contrary evidence. Plaintiff disputes the following factual contentions relied on by HP:

1.    "Siegel was hired by Electronic Data Systems Ltd. ("EDS Ltd.") in June 2006 to work in EDS Ltd.'s London office. Complaint, ¶ 8." HP page   Plaintiff disputes that this statement appears in the Complaint paragraph 8. The company name is not stated as EDS Ltd. and the location of London is not named. Plaintiff admits that he worked for the EDS global organization in the UK prior to the acquisition of the EDS global organization by HP.

2.    "At all relevant times, Siegel was either an employee of EDS Ltd. or an employee of HPES UK Ltd."  There is no evidentiary basis given for this statement and Siegel disputes it. (Siegel Declaration paragraph 3, format hereinafter "Siegel ¶ 3" )

3.    "HPES UK Ltd. (and before it EDS Ltd.) operates independently from HP during Siegel's employment and continues to operate independently today. No HP employees were involved in the day-to-day operations of HPES UK Ltd. or EDS Ltd. HPES UK Ltd."  Plaintiff disputes this statement and has presented extensive evidence that HP Enterprises Services UK Ltd is part of an integrated global organization including Hewlett Packard Company and subsidiaries worldwide. HP represents itself to customers and employees as a single integrated global organization. HP Enterprise Services UK Limited is not even able to operate independently. The annual reports filed with the UK government establish that it is financially dependent on HP and the other subsidiaries. Essential functions such as Human Resources, financial record keeping, administration, employee occupational health are assigned by HP to itself and to other HP subsidiaries which perform these functions on a global basis for many entities throughout HP. Plaintiff has presented extensive evidence of specific day to day control of his activities and decisions relating to him by HP through Hewlett Packard Company and other subsidiaries. Siegel ¶   4, 9, 10, 11,12, 13, 14, 16, 19, 25, 26, 27, 30, 31 32, 33, 34, 35, 36,

37, 38, 39, and 40.   Ford Declaration paragraph (format hereinafter "Ford ¶") _____, Response to Request for Admissions by HP (hereinafter "Admission") 22, 23, 31, 32, 33, 40, 41, and 42.

4.      "HPES UK Ltd. and EDS Ltd. made their own decisions as to hiring, discipline, and termination of their employees without involvement from HP."  Plaintiff disputes this and presents evidence on this point even in his own case. Seigel ¶ ¶ 9, 33, 34, 37, 40, 47, 48 and 49.

5.      "At all relevant times, EDS Ltd. and HPES UK Ltd. operated their headquarters out of a building located in the UK." "EDS Ltd. and HPES UK, Ltd. also maintained their own office space in the UK, and leased office space under their own names." Plaintiff does not dispute that HP Enterprise Services UK Ltd had office space. However it was not exclusive to it and was shared with at least six other HP subsidiaries. Ford Exhibit __, Seigel ¶ 20 In addition, the rate payer and therefor the official occupier of the property is another subsidiary, Hewlet Packard Limited. Admission 31 and 32. In all probability, the lessor on the lease HP relies on is HP or one of its subsidiaries.

6.      "EDS Ltd. and HPES UK, Ltd. determined bonuses and pay raises for their employees." Plaintiff disputes this and has submitted evidence that HP set compensation at the time of the acquisition of EDS to fit within its standards. Also, after the EDS acquisition the performance review system was merged into the HP electronic database and these matters were handled thereafter in accordance with the model dictated by HP. Finally, as an example of the external control, after the acquisition the CEO of Hewlett Packard reduced wages for EDS employees including those at HP Enterprise Services UK Ltd and its predecessor. Later a new CEO at Hewlett Packard increased the wages. Siegel ¶ 35 and 36

7.      "EDS Ltd. and HPES UK Ltd. maintained employment policies that are specific to employees in the UK. In fact, Siegel's Complaint even references the "UK / Sickness & Long Term Absence Policy."  Plaintiff disputes the generalized conclusory statement. In addition he specifically provides evidence and testimony that the sickness policy was set by HP to conform to its global standards.  Siegel  ¶ 10.

8.      "There is no overlap in the directors and officers of either EDS Ltd. or HPES UK Ltd on the one hand and the directors and officers of HP on the other hand." Plaintiff does not

dispute that there were no directors of Hp simultaneously serving as directors of HP enterprise Services UK Ltd. However, it is also true that there were frequent changes and transfers of directors. It is also true that the named directors of UK Ltd also simultaneously served as directors of numerous other subsidiaries of HP. Ford Exhibit __.

9.     "During his employment, Siegel communicated with Peter Parry, Andy Guile, John Waterfield, and Yvonne Ben Fredj regarding his injuries and accommodation requests." Plaintiff does not dispute that he communicated with these individuals. Plaintiff does dispute that these are the only persons he communicated with or that these were the only HP personnel involved in these matters.[3]   Siegel ¶¶ 11, 12, and 13.

10.     "No employee of HP played any role in handling Siegel's medical claims or requests for accommodations.  All decisions and discussions regarding Siegel's injuries and reasonable accommodations were made by employees of HPES UK Ltd. or its predecessor, EDS Ltd. Id. HPES UK Ltd. and EDS Ltd. employees did not consult HP before making those decisions." Plaintiff disputes this. As a matter of fact the evidence establishes that not only were individuals outside HP Enterprise Services UK Ltd consulted, they were often acting on their own with respect to Siegel's situation independent of UK Ltd.  Siegel ¶ 11.

11.     "Siegel admits that, "[t]he employment records relevant to [his] employment are maintained and administered in the UK." Complaint ¶ 4 (emphasis added). At all relevant times, HPES UK Ltd. and EDS Ltd., have maintained Siegel's employment records in the UK." This point is of marginal relevance. Control and not location is the issue.  However, discovery has shown that this allegation in t4he unsworn complain is inaccurate. The records disclosed in discovery by HP show that the employment records were kept electronically in centralized databases at HP. Moreover there were central HP websites established for various HR matters. Ford Declaration _____ Siegel ¶ 37 Admissions _____

_____

[3]   Defendant HP appears to operating under the erroneous assumption that Plaintiff is not allowed to present facts or evidence not included in the complaint. However, Plaintiff is not limited to the precise facts stated in the complaint. Rule 8 of the Federal Rules of Civil Procedure states that the complaint must contain a "short and plain statement of the claim." Fed. R. Civ. P. 8. Under Rule 8, Plaintiff is not required to plead all the facts relating to the claim. Rather, the Plaintiff "is required only to give notice of the claim such that the opposing party may defend himself or herself effectively." *Starr v. Baca*,   633 F.3d 1191, 1201 (9th Cir.2011). Defendant can then utilize discovery mechanisms, such as interrogations, to ascertain more details regarding the complaint's allegations. *Remick v. Manfredy*, 238 F.3d 248   (3d Cir.2001). Accordingly, under Rule 8, Plaintiff must plead enough fact to raise reasonable expectation that discovery will reveal evidence to support allegations. Plaintiff has done so in this case, and is not bound to only those statements present in the complaint.

12.    "At all relevant times, Siegel performed his duties under the supervision, direction, and control of Parry, Guile, and Waterfield. EDS Ltd. and then HPES UK Ltd. alone determined the duties Siegel would perform, assessed his performance, paid his salary, and withheld his taxes. At no time did employees of HP have any authority to supervise, control, or direct Siegel's employment activities."   Plaintiff admits that he was supervised by Parry and Waterfield. Guile was a manger to whom he did not report but who had management authority. Plaintiff presents extensive and powerful evidence to dispute that Parry and Waterfield were the only mangers who supervised, him and directed his work. He has proven that he was also under the direction supervision and control of managers from other parts of HP and even from executive s of Hewlett Packard Company in California. Siegel   ¶ ¶ 11, 14 ,24, 25,  30, 31, 38, 42, 43, and 46.

13.    "Siegel's own e-mail signature block indicates that he was an employee of "HP Enterprise Services Ltd." plaintiff disputes this Seigel ¶23

14.    "Siegel's "P45" form1 reflects that HP Enterprises Services UK Ltd. was his employer at the time of his termination. Further, Siegel's paystub reflecting his supplementary payment for mileage upon termination lists his employer as HPES UK Ltd. This Supplementary Payment form states that should he have any questions he may contact Carol Seward, a member of HPES UK Ltd.'s Payroll Department." Plaintiff disputes the conclusions HP seeks to draw from these records and presents other records which refute these conclusions. Siegel ¶ 21 and Exhibit__

**B.  Plaintiff's facts and evidence in support of ADA Liability.**

Plaintiff has filed herewith abundant evidence in each of the four areas identified by the statute. Given the page limitation it is impossible to list in detail all of the evidence presented in this document. However, the following sets out the key areas of evidence presented.

**1.  Interrelation of Operations**

HP operates as a single, integrated global organization. The annual reports filed by HP with the SEC indentify the company and its subsidiaries as a single integrated whole. It describes itself as a single global organization. This description includes its subsidiaries including HP

Enterprise Services UK Ltd which it contends employed Plaintiff.[4] The employee compliment figures for HP set out in its annual report admittedly include the employees of the subsidiaries including HP Enterprise Services UK Ltd. Admission 22. The consolidated financial statements in the annual report to shareholders also include the financial of HP Enterprise Services UK Ltd. Admission 23. In fact, 63% of HP's revenues come from outside the US through its foreign subsidiaries. Annual report p 23.

The press releases and annual reports to the UK and US government presented herewith as evidence emphasize the integrated global nature of the operation. See exhibits ____ to Ford declaration, Admissions ____ and related exhibits. The transcript of testimony by a top financial officer with Hewlett Packard before a Senate committee (Judical Notice Exh.A) emphasizes the integrated global operation.

Ethical, environmental, rights of employees and the disabled, and other issues of global corporate citizenship are handled for all the subsidiaries including UK Ltd are handled centrally by HP. See Global Citizenship Report Ford ____Exhibit __ As the 2008 annual report filed in the UK by HP Enterprise Services UK Ltd states

> "Hewlett-Packard Company, for which HP Enterprise Services UK Limited is a subsidiary, publishes an annual corporate responsibility report where detailed company wide environmental commitments, initiatives and key performance indicators can be found."

HP divides its operation into multiple "business segments" one of which is Enterprise Business. These business segments operate across corporate entity lines within the HP organization.  Enterprise Business specializes in very large corporate customers that normally enter into global or multinational contracts. Enterprise Services refers to the part of Enterprise Business which provides IT services as opposed to other products such as hardware. See Siegel ¶ 4, 5, 17, 23, and 24 and annual Report filed by HP with the SEC for the year 2011 on page 4, 11, 12. HP Enterprise Services UK Ltd is part of the Enterprise Business/Enterprise Services along with many other subsidiaries worldwide and parts of Hewlett Packard Company. Enterprise Business and Enterprise Services is headed by Ann Livermore, a top level executive in Hewlett

---

[4]   The statements in the filings constitute admissions of a party and are binding on HP.  Federal Rule of Evidence 801(d)(2)

Packard Company. Siegel ¶ 14 and Annual Report ___. Enterprise Business and Enterprises Services operate globally and incorporate employees and operations of many subsidiaries. The HP 2011 annual report on page 25 states that the services segment of the business in which Plaintiff Seigel was engaged is an increasing segment of HP's business. Thus, the activities of Plaintiff and other employees of HP Enterprise Services Limited UK are not separate or tangential to the operations of HP. They are a critical core function of HP and a major source of revenue.

In 2008 HP acquired another global company, EDS based in the US in Plano Texas. At the time of the acquisition Siegel was employed by EDS. For about two years after the acquisition HP made huge changes in the organization and operation of the former EDS. This included changing job titles, job roles, compensation, benefit plans, policies and procedures to merge the EDS workforce with HP and to establish HP norms in all these areas. Siegel ¶ 2, 4, 9, 10, 33, 34, 35, 36, 37, 39, and 49 HP reduced the workforce substantially and transferred employees to other parts of the HP organization or laid them off. In other cases HP employees have been transferred into UK Ltd. All these organizational decisions were made by HP and not on the local level. On page 28 the annual report describes the workforce restructuring after the acquisition and merger of EDS into HP. The statement in the report admits that HP controlled and conducted this restructuring. The other annual reports include the same or similar statements.

As part of this restructuring HP set up a day to day operation in which fundamental business functions such as leasing real estate, human resources, processing expense reports, maintaining employee records, maintaining time records, banking, government filings, occupational health and safety were handled by specialized subsidiaries. Seigel ¶16, 19, and 41, HP Enterprise Services UK Ltd annual report _____ HP Enterprise Services UK Ltd relies on Hewlett Packard to handle its treasury functions and its relies on Hewlett Packard Company and its other subsidiaries for funding through loans and other devices. Plaintiff has sought depositions of the witnesses who gave declarations in support of the MSJ to explore these interrelationships and establish evidence on this point. However, to date Plaintiff has not been able to take the depositions.

There are regular transfers of employees between subsidiaries. In such transfers the formalities of which subsidiary an employee works for are largely ignored. See Siegel declaration Exhibit __. Another example  of interrelated operations is the fact that there is a single central American Express log in page for HP organization employees regardless of subsidiary affiliation to log into to conduct business concerning company credit cares. Admission 30.

The day to day operations involved providing services to customers who had agreements with HP that were global in scope and required interrelated providing of goods and services from many different subsidiaries under the supervision and at the direction of HP. These contracts required integrated day to day operations described below. Plaintiffs have sought copies of the agreements and other information concerning billing and other financial aspects to show that this is handled on an integrated basis. However, to date Plaintiff has been denied such documents and information.

HP makes much of the fact that a lease exists for its office space on Cain Road in Bracknell. However, the lease it relies on is only the signature page and does not reveal the lessor. The tax rolls in the UK show that the occupier of the property is Hewlett Packard not HP Enterprise Services UK Ltd. HP admits that Hewlett Packard Limited is the taxpayer for the property. Admission 32.  Presumably the lessor is Hewlett Packard or possibly yet another subsidiary of HP. Plaintiffs have sought a full copy of the lease from HP but it has not been produced. As Exhibit __ to the Ford Declaration shows, HP lists at least six subsidiaries at that address. Mr. Siegel reports that he has been to the office building and the employees of all the companies work in un-segregated spaces. No one walking though the office would be able to tell which employee worked for which company. The space is completely integrated and the activities of the employees interrelated.

The declarations submitted by HP are actually excellent evidence of this interrelationship. Three of the four witnesses, Johnson, Sales, and Wildish do not work for HP Enterprise Services UK Ltd. Each of those three describes his or her functions and admits to performing tasks

essential to the operation of the subsidiary. They also claim intimate knowledge of these functions within the subsidiary as a result of their jobs. The truth is that UK Ltd is a shell which cannot operate independently.  It has no ability to perform these tasks such as banking, real estate and administration on its own. These functions are performed by other parts of the integrated whole.

## 2.  Common Management

Plaintiff asserts that HP exercises day to day management with respect to HP Enterprise Services UK Ltd and its employees. Although he has been denied any discovery on this point, he has presented evidence in support of this operation. Regular directions and communications to him from HP in the US are described in Siegel's declaration paragraphs 38, 25 and the exhibits thereto. The exhibits show e mail communications from the highest levels within HP to Mr. Siegel. However he has been denied copies of all e mails sent to him and by him while employed at HP on the grounds they would be irrelevant. There would be many more e mail communications showing direct control over Seigel from HP in the US. Further, presumably there are similar communications to and from other managers at HP Enterprise Services UK Ltd but none have been provided.

The following facts relate to both interrelation of operations and common management. The normal day to day operations at HP Enterprise Services UK Ltd involved working on teams established by HP on a client by client basis for the most part these were not clients based in the UK and virtually all were international in scope. The teams were made up of individuals from different subsidiaries and from Hewlett Packard. As a management member of such teams, and specifically in the role of Chief technology Officer Mr. Siegel regularly received supervision and direction from managers employed by HP in the US. Siegel ¶ 38 and exhibits thereto. He also routinely on a day to day basis supervised and directed the work of employees of companies in the HP organization outside of HP Enterprise Services UK Ltd. For example, in the case of Aon Insurance, the last customer Mr. Siegel was assigned to and for whom he worked in 2010 and 2011, the customer was a global company based in the US.  One of  the employees assigned to

report to Mr. Siegel on the team was Tim Stephenson who did not work for HP Enterprise Services UK Ltd but for another subsidiary. Siegel 43 The team was headed by Sean Wells, the Global Account Executive representing HP on the Aon account and based in US. He "owned" the account within HP. As the Chief Technical Officer on the team Siegel worked under Mr. Wells and received direction from him. Ian Oldfield, another manager on the team was Siegel's day to day supervisor with respect to the Aon account. Oldfield worked in the EMEA business group and his e-mail signature line indicates he did not work for HP Enterprise Services UK Limited. (See Siegel Exhibit M) Another manager on the team, Tom Rebecca, was HP's US account executive for Aon.  He worked for HP in the US and did not work for HP Enterprise Services UK Ltd.  Siegel also received direction from him concerning the Aon account. There was also an HP "executive sponsor" for the Aon account (see slide 22 showing the responsible team members for HP and Aon in each area of the world) and his name was John McMullen. He was the Senior Vice President and Treasurer for Hewlett Packard Company in California. The executive sponsor on an HP global team is responsible for meeting with the client and they serve as the ultimate escalation point for direction and supervision on the account. In normal HP practice the person in Sean Wells' position would provide regular reports and updates to Mr. McMullen and directives would have come down from McMullen to Wells which would be communicate to the rest of us on the team. The Aon team described was the typical way in which the teams for the international clients I worked on were constituted and functioned on a day to day basis.  Siegel ¶ 25

### 3. Centralized Control of Labor Relations

Plaintiff has presented extensive evidence of centralized control of labor relations. This includes HP setting compensation, job titles, roles, HR policies. Mr. Siegel's Job title was changed as were the policies that related to his employment. These changes were made by HP to conform to the HP standard. As the 2008 annual report filed by HP Enterprise Services UK states:

> Hewlett-Packard Company, for which HP Enterprise Services UK Limited
> is a Subsidiary, publishes an annual corporate responsibility report where detailed

company wide employee commitments, initiatives and key performance
indicators can be found. See Global Citizenship report attached to Ford
Declaration.

HP has a central website for Hewlett Packard which has a job application portal. In using the portal it is impossible to see any distinction for separate subsidiaries. Hewlett Packard centrally accepts applications for employment

After the acquisition HP promulgated a global program under which employees were to give back a percentage of their salary.   This applied globally to the subsidiaries in the HP organization. It applied to employees assigned to HP Enterprise Services UK Ltd. This was put in place by HP CEO Nick Hurd. Later, the new CEO of  HP, Leo Apotheker, ordered reimbursement to affected employees. This is an example of direct control of compensation of HP Enterprise Services UK Ltd employees by the top management of HP. Siegel paragraph 36

HP has a Global Ethics group which is part of Hewlett Packard. The Global Ethics group sets ethical standards for employees of the HP organization which are applicable worldwide across all the subsidiaries including HP Enterprise Services UK Ltd. Employees of all the subsidiaries including HP Enterprise Services UK Ltd. are not only expected to follow the rules which amount to employment rules or policies, they are invited to report any violations to the central Global ethics office. If there is suspected ethical breaches anywhere in the HO organization across all the subsidiaries, Global ethics is empowered to and does conduct investigations of employee misconduct and take or effectively recommend action. Plaintiff has sought to take the deposition of the head of the Global ethics group and otherwise obtain discovery concerning the activities of this group but this has been denied. This discovery would yield further evidence. See Global citizenship report, Ford Exhibit __ pages 18-21.

In another example, an HR person from HP in the US, Cynthia Pye, came to HP Enterprise Services UK Ltd to oversee the transition of customer employees who were being transferred into UK Ltd. she controlled assignments, roles, titles and reporting and she trained the employees. In fact she specializes in doing this for HP in its subsidiaries worldwide.  Siegel ____

HP makes much of the fact that there is a UK policy concerning long term illness. A copy of the policy is attached to the Siegel Declaration. The footer on the last page of the policy reflects that it was set by Hewlett Packard after the acquisition to meet HP standards. It is an HP policy and is evidence of centralized control.

### 4. Common Ownership or Financial Control

It is not disputed that HP holds a 100% ownership interest in HP Enterprise Services UK Ltd. However, the evidence in this area does not end there. It is worthy of note that the witness for HP in connection with this motion concerning financial matters for HP enterprise Services UK Ltd. is an employee of a different subsidiary. Presumably this is because these financial functions of UK Ltd are performed by a different part of the HP organization.  The 2008 annual report filed by UK Ltd with the government of the UK states on page 16:

> Treasury policy
>
> Hewlett-Packard Company, the ultimate parent company, has a centralised treasury function which manages the overall group's Treasury policy and requirements….The company finances its operation by a mixture of short and long tern loans from Hewlett-Packard Company subsidiaries and capital markets.
>
> Foreign currency risk
>
> The company borrows and holds cash balances in both Sterling and US Dollars Hewlett-Packard Company's centralised treasury function manages foreign currency risk for the wider group, including HP Enterprise Services UK Ltd.

This financial reliance and looking to HP for financial support in the form of loans or otherwise shows financial interrelationship and financial control by HP. Plaintiff has also sought discovery in this area including the deposition of the financial witness for HP in this motion. However, to date this discovery has been denied.

### 5. Individual conduct concerning Siegel and his claims in this case.

In addition to the forgoing evidence meeting the statutory requirements, Plaintiff has presented the following evidence concerning challenged conduct and decisions at issue in this case which is directly attributable to managers and employees of HP entities other than HP Enterprise Services UK Ltd, including the overall parent, Hewlett Packard Company. There is

not sufficient room to set all these out here but the declaration and exhibits thereto establish that HP was involved directly in the conduct and events complained of. They are set out more fully in paragraph 11 of the Siegel Declaration. The decisions in which individuals outside UK Ltd were involved included the removal of his home office equipment, the refusal of his request to keep the equipment as and accommodation, the failure or refusal to do an occupational health assessment, the failure to allow him to transfer and to assign him to another customer.

### IV.   Applicable Legal Standards

#### A.  Standard for Denial of a Motion for Summary Judgment.

The standard for grant of summary judgment is stringent. Federal Rule of Civil Procedure 56(c) permits the Court to grant summary judgment only when there is no genuine issue of material fact and when the moving party is  entitled to judgment as a matter of law. *Sartor v. Arkansas Natural Gas Corp*., 321 U.S. 620, 64 S. Ct. 724, 88 L. Ed. 967 (1944); Tee-Pak, Inc. v. St. Regis Paper Co., 491 F.2d 1193, 1195 (6th Cir. 1974). In deciding a Motion for Summary Judgment, the Court must construe evidence most favorably to the opposing party. *Bohn Aluminum & Brass Corp. v. Storm King Corp*., 303 F.2d 425, 427 (6th Cir. 1962).

In evaluating the record to determine whether there is a genuine issue as to any material fact, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [his] favor." *Anderson v. Liberty Lobby,* 477 U.S. at 255, 106 S. Ct. at 2513; *Chambers v. TRM,* 43 F.3d at 36; *Gallo v. Prudential*, 22 F.3d at 1223. The Court draws all inferences in favor of the nonmoving party only after determining that such inferences are reasonable considering all the evidence presented. See, e.g., *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir.), cert. denied, 484 U.S. 977, 108 S. Ct. 489, 98 L. Ed. 2d 487 (1987) If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM*, 43 F.3d at 37.

#### B.  Standard for Extraterritorial Application of the ADA

The ADA applies to employment of a US citizen such as Plaintiff Siegel by a US company such as HP. 42 USC § 12111(4) provides "The term 'employee' [under the ADA]

means an individual employed by an employer. With respect to employment in a foreign country, such term includes an individual who is a citizen of the United States." So it is undisputed that Mr. Siegel, as a US citizen employed in the UK, falls within the definition of an employee under the ADA. The question then becomes whether Mr. Siegel is "an individual employed by an employer" covered by the ADA.  The ADA provides very explicit standards for making this determination and this is admitted by HP in its Motion.   42 USC Sec. 12112 provides in pertinent part as follows:

> (c) Covered entities in foreign countries
> ….
> (2) Control of corporation
> (A) Presumption
> *If an employer controls a corporation whose place of incorporation is a foreign country, any practice that constitutes discrimination under this section and is engaged in by such corporation shall be presumed to be engaged in by such employer.*
> (B) Exception
> This section shall not apply with respect to the foreign operations of an employer that is a foreign person not controlled by an American employer.
> (C) Determination
> For purposes of this paragraph, *the determination of whether an employer controls a corporation shall be based on—*
> > *(i) the interrelation of operations;*
> > *(ii) the common management;*
> > *(iii) the centralized control of labor relations; and*
> > *(iv) the common ownership or financial control,*
> *of the employer and the corporation.* (emphasis added)

Thus, the standard for Plaintiff to prevail as to coverage of the ADA over his employment and liability of Hewlett Packard Company for its UK subsidiary HP Enterprise Services UK Ltd. and its predecessors is the four part test set out in 42 USC 12112(c)(2)(C). In bringing this motion HP pays lip service to this statutory standard and then goes on to totally ignore it relying almost exclusively on common law cases which do not interpret that provision.

The statutory standard set out above has its origins in federal common law developed under the National Labor Relations Act and known as the single employer doctrine. The single employer doctrine applies "in the case of two ongoing businesses which the NLRB wishes to treat as a single employer on the ground that they are owned and operated as a single unit."

*NLRB v. Hosp. San Rafael*, 42 F.3d 45, 50 (1st Cir. 1994), cert. denied, 516 U.S. 927 (1995). The motive of the employer is irrelevant to a single employer analysis. *Id*. The reality of the situation is controlling. The Supreme Court has adopted the NLRB's four part single employer analysis, identical to that set out in Section 12112(c)(2)(C). *Radio & Television Broadcast Technicians Local Union v. Broadcast Serv., Inc*., 380 U.S. 255 (1965) *Prairie Constr. Co. v. Int'l Union of Operating Engineers* (Peter Kiewit) 425 U.S. 800 (1976) affirming in relevant part *Local No. 627, Operating Engineers v. NLRB* 518 F.2d 1040 (1975). In *Radio Union v. Broadcast Service*, the Supreme Court, in a *per curiam* opinion affirming a "single employer" holding below, held:

> "The controlling criteria [for single employer status] are interrelation of operations, common management, centralized control of labor relations and common ownership."

All four criteria need not be present in all cases and, even when no evidence of common control of labor relations policy is presented, the circumstances may be such that the single-employer doctrine is applicable. See *Metropolitan Detroit Bricklayers v. J.E. Hoetger & Co*., 672 F.2d 580, 584 (6th Cir. 1982); *Local No. 627, Operating Engineers v. NLRB*, 171 U.S. App. D.C. 102, 518 F.2d 1040, 1045-46 (1975), aff'd in relevant part sub nom. *South Prairie Construction Co. v. Local 627, Operating Engineers*, 425 U.S. 800, 48 L. Ed. 2d 382, 96 S. Ct. 1842 (1976)

The NLRB's single employer standard has been given effect by the Ninth Circuit. *Sakrete of Northern California, Inc. v. NLRB*, 332 F.2d 902 (9th Cir. 1964) cert. denied, 379 U.S. 961, 85 S. Ct. 649, 13 L. Ed. 2d 556 (1965), *A. M. Andrews Co. of Oregon v. N.L.R.B*., 9 Cir., 236 F.2d 44. In *NLRB v. Welcome-American Fertilizer Company* 443 F.2d 19, 20 (9th cir 1971), relied upon by HP in its brief, the Ninth circuit held as follows:

> The principal factors which the Board weighs in deciding whether sufficient integration exists to treat separate concerns as a single employer are:
>
> 1. Interrelation of operations;
>
> 2. Centralized control of labor relations;
>
> 3. Common management; and

4. Common ownership or financial control.

*Radio & Television Broadcast Technicians Local Union v. Broadcast Service of Mobile, Inc*., 380 U.S. 255, 85 S. Ct. 876, 13 L. Ed. 2d 789 (1965). **No one of these factors is controlling**, but emphasis is placed on the first three, as they tend to show operational integration. *Sakrete*, supra.

In *Sakrete* the only evidence of control by the parent company was at the top level and the Ninth Circuit found:

> [E]ven if the substantial evidence shows interrelationship of operations, centralized control of labor relations, or common management only at the executive or top level, we do not agree that this precludes application of the "single employer" concept. … no other reason is suggested or occurs to us why mutuality of control at the local level must be shown. Seldom would it be practicable for two companies situated in different parts of the country to be managed at the local level by one man or management group. If there is overall control of critical matters at the policy level, the fact that there are variances in local management decisions will not defeat application of the 'single employer' principle." 332 F.2d at 907

In *Sakrete Of Northern California, Inc. And Freight, Construction, General Drivers And Helpers, Local 287* 137 N.L.R.B. 1220 (1962), the decision of the NLRB affirmed by the Ninth Circuit in Sakrete and cited with approval and followed by the Supreme Court in *Radio & Television Broadcast Technicians*, the NLRB discussed the evidence which can be used to meet each of the four criteria:

> Conventionally, Board determinations finding functional integration between nominally separate business firms reflect the Agency's consideration of testimonial or documentary evidence regarding: (1) Shared or leased premises, facilities, or equipment (2) shared, or freely interchanged, managerial, clerical, or production workers; (3) substantial reliance by one firm upon services provided by the other or (4) one firm's status as a regular user, manufacturer, processor, transporter, or handler of goods or materials provided by the other firm, either as part of some "straight-line operation" or some unified production effort.

> Board decisions note "centralized control of labor relations" frequently as a significantly determinative factor in determinations regarding the presence of operational integration between separate concerns sufficient to warrant their treatment as a single employer for jurisdictional purposes.

Record evidence normally considered relevant to such determinations may reflect: (1) responsibility for decisions with respect to labor relations matters delegated to a single management official or department ; (2) centralized management decisions regarding wage rates, work schedules, fringe benefit programs, and other working conditions, promulgated and effectuated without distinction between similarly situated employees of two or more separate concerns; or (3) centralization of hiring, discharge, and personnel record functions for separate concerns. No cases have come to my attention wherein control of labor relations matters for separate concerns was found sufficiently centralized merely because policy determinations with respect to such matters were made by a single management official without proof that such determinations--nominally made for separate business enterprises--revealed some degree of coordination or deliberate parallelism.

Conventionally, Board determinations finding "common management" present as a factor revelatory of significant integration, affecting two business enterprises nominally distinguishable, have rested upon record evidence that: (1) some single management representative or managerial group routinely supervises daily operations; (2) one accounting department or firm of auditors provides unified or centrally directed accounting or auditing service; (3) centralized or common facilities are provided for the purchase and distribution of mutually required equipment materials and supplies. At 1227-1228.

Plaintiff here presents substantial and irrefutable evidence on most of these points.

## C. The Title VII Single Employer Doctrine Does Not Control Here

In recent years, some courts have applied concepts from the NLRB single employer doctrine to develop federal common law pursuant to various other employment law statutes. *Sharpe v. Jefferson Distrib. Co*., 148 F.3d 676, 678 (7th Cir. 1998) However, this has been a matter of common law and not a statutory mandate. More important, the exact test or analysis of what constitutes a "single employer" has varied from court to court and statute to statute. The test under the WARN Act might be different that that under Title VII for example. These varied tests may, or may not, apply the NLRB's four part test. In fact, the courts even use the term "Title VII single employer doctrine" thus distinguishing it from the NRLB single employer doctrine.  See *Armbruster v. Quinn*, 711 F.2d 1332, 1337-1338 (6th Cir. 1983) overruled on other grounds 546 U.S. 500. Thus, it is clear that a common law doctrine has been developed under Title VII and other statutes which bears the same name but is often distinct from the original four part NLRB single employer doctrine. As can be seen from the somewhat scattered

decisions relied upon by HP, some courts have adopted some parts of the NLRB test and not others. Other courts have looked to the traditional concepts of piercing the corporate veil and the like either as an alternative to or in place of the four part test for a single employer.[5] HP relies on a scattering of selected decisions from varied jurisdictions and arising in varied circumstances. The decisions do not represent a coherent picture of the state of the single employer doctrine and ignore the vast differences between the courts to have considered the matter.  In any event, all of these common law tests are inapplicable here. The claim here rests squarely on a specific statutory test drawn from the NLRB doctrine.  See EEOC guidelines Ford _____

The Title VII common law single employer doctrine on which HP relies is applied where the question at issue is whether a violation of Title VII by one company in the US should be liable for violations of Title VII by another US company. In such a situation, as some courts have noted, the public policy concerns relating to piercing the corporate veil come into play. After all, the employee can bring the claim against either company. However, Congress made a conscious choice to provide an avenue for US citizens employed by foreign subsidiaries of a US company to enjoy and enforced their rights under the ADA.  In the absence of application of 12112(c)(2)(C) Plaintiff Siegel would have no means to vindicate his rights under the ADA. The history of the enactment of 12112 is set out in the EEOC guidelines for enforcement, a copy of which is attached to the Ford Declaration as Exhibit __ for the Court's convenience. In short, in the companion cases of *EEOC v. Arabian American Oil Co*. and *Boureslan v. Arabian American Oil Co*., 499 U.S. 244, 111 S. Ct. 1227 (1991) ("Boureslan"), the US Supreme court held that Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., did not apply extraterritorially to regulate the employment practices of United States employers that discriminate against United States citizens abroad. In response, Congress enacted the changes at issue here which assured the application of Title VII and the ADA to US citizens employed abroad. The legislative history makes clear that the purpose of Section 109 was to respond to the

---

[5]  See eg *Lusk v. FoxMeyer Health Corp*., 129 F.3d 773 (5th Cir.1997) at 778 ("Only evidence of control suggesting a significant departure from the ordinary relationship between a parent and its subsidiary-domination similar to that which justifies piercing the corporate veil-is sufficient."); *Sargent v.McGrath*, 685 F. Supp. 1087, 1088-89 (W.D. Wis. 1988) ("In the absence of special circumstances, a parent corporation is not liable for the Title VII and section 1981 violations of its . . . subsidiary."). Even a cursory reading of 12112(c)(2)(C) establishes that Congress intended a different test to apply under its provisions. The presumption under 12112 is that the parent company *is* liable for ADA claims involving the foreign subsidiary.

*Boureslan* decision. Section 109 was expressly intended to "extend the protections of [Title VII and the ADA] to American citizens working overseas for American employers," 136 Congo Rec. 515,235 (daily ed. Oct. 25, 1991) (statement of Sen. Kennedy). The situation presented here falls squarely within this legislative purpose. This is exactly the situation that Congress had in mind in enacting 12112(c)(2)(C).

Thus, Congress has chosen the test to be applied and it chose the traditional four part test developed under the NLRA. It also chose to specifically address the issue presented where a US company owns a foreign subsidiary and employs US citizens through that foreign subsidiary. Common law decisions under Title VII and other employment statutes are irrelevant to the instant case because the only test that can be applied here is the one set out in the statute. The only decisions that could be controlling would be those decided under the applicable statutory standard. Moreover, only decisions which fully apply the four part standard can serve as even persuasive authority.

## V.     The Legal Standard on Which HP's Motion Rests Is In Accurate.

The fundamental basis for HP's motion is the contention that in order to establish the requisite control by HP over HP Enterprise Services UK Limited, Plaintiff has to produce evidence that managers employed by HP made the precise decisions and engaged in the conduct which forms the basis of the lawsuit. This completely misstates the applicable standard, even under the cases on which it relies, and flies in the face of the clear statutory language. [6] HP also suggests that Plaintiff must show that there is something atypical or unusual about the relationship between Hewlett Packard Company and its subsidiaries as opposed to common operating practice between a parent company and subsidiary. However, this standard appears nowhere in the statute at issue and is not even part of the Ninth Circuit's view of the Title VII single employer doctrine. The idea is drawn from some of the decisions from other circuits and other circumstances where ideas of piercing the corporate veil have crept into the analysis. It has no application here and cannot be used to vary the statutory test.

---

[6]   Of course, Plaintiff has submitted extensive evidence that the exact decisions and conduct challenged here were either undertaken by HP management outside of HP Enterprise Services UK Ltd. or that individuals outside of HP Enterprise Services participated in the challenged decisions and conduct. See e.g. Siegel Declaration Paragraph 11.

Section 12112 clearly sets out four factors for a finding in favor of Plaintiff and none of these factors is that the decision maker in the challenged decision must be employed by the parent company. HP asks this court to ignore the plan language of 12112 and to adopt a more narrow standard which does not appear anywhere in the statutory language.  The Supreme Court held in *Bickford v. United States*, 228 Ct. Cl. 321, 326  (1981)

> Courts should "respect the most fundamental of all canons of statutory construction: that statutes mean what they plainly say. As Chief Justice Marshall stated more than a century and a half ago:
>
> > The intention of the legislature is to be collected from the words they employ. Where there is no ambiguity in the words there is no room for construction. The case must be a strong one indeed, which would justify a court in departing from the plain meaning of words . . . in search of an intention which the words themselves did not suggest. [Emphasis added.] *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95-96 (1820).
>
> In sum, nothing suggests that Congress either expressly provided or intended for [the statute at issue] to apply more narrowly than its literal language.

The Ninth Circuit applies this cannon of statutory construction as well. *United States v. King*, 244 F.3d 736, 740 (9th Cir. 2001) ( "Unless the plain meaning leads to an absurd or unreasonable result, which it does not here, our 'judicial inquiry is at an end.'" (citation omitted)); see also *United States v. Gonzales*, 520 U.S. 1, 8, 117 S. Ct. 1032, 137 L. Ed. 2d 132 (1997) ("Where there is no ambiguity in the words, there is no room for construction. The case must be a strong one indeed, which would justify a court in departing from the plain meaning of words . . . in search of an intention which the words themselves did not suggest." (internal citation and quotation marks omitted)). In *United States v. Trapilo*, 130 F.3d 547, 551 (2nd cir 1997)  the court analyzed this issue as follows: "The intention of the legislature is to be collected from the words they employ. Where there is no ambiguity in the words, there is no room for construction. The case must be a strong one indeed, which would justify a Court in departing from the plain meaning of words . . . in search of an intention which the words themselves did not suggest." Quoting *United States v. Wiltberger*, 18 U.S. 76, 95-96, 5 L. Ed. 37 (5 Wheat.) (1820) (Marshall, C.J.).

Thus, HP's assertion that the four part test set out in the statute should be disregarded in favor of a much narrower standard is without merit. It is worthy of note that HP cites no decision from the Ninth circuit concerning the Title VII single employer doctrine. As discussed above, the circuits have established differing standards on this point.  It is worthy of note that, given the inconsistent positions taken by the various courts, HP has chosen not to rely on 9th circuit precedent. In the Ninth circuit it is established that the single employer doctrine under Title VII is identical to the NLRB. See *Childs v. Local 18, International Brotherhood of Electrical Workers*, 719 F.2d 1379.  Thus, even if the Title VII single employer doctrine were applicable, the test in the Ninth circuit is the four part NLRB test and related precedent. It is not piercing the corporate veil or the more limited view of another circuit.

## VI.    The Decisions On Which HP Relies Are Distinguishable And Do Not Apply

Many of the decisions on which HP relies involve situations where, unlike here, there was no evidence to show control of the subsidiary by the parent company. Thus, HP relies on the result without examining the overall level of evidence produced. Some of the decisions point out that the challenged decisions were made without evidence of input from the parent company. However, these cases are not authority for the proposition that such evidence is essential to Plaintiffs case or that the four part statutory test should be abandoned.  HP has cited a number of decisions for the proposition that the employing entity of the alleged wrongdoer is the only pertinent issue when the decisions make no such holding. As the Plaintiff here has presented abundant specific evidence meeting the statutory standard, grant of summary judgment would be improper.

HP seems to have chosen a scattering of decisions from various jurisdictions and involving varied factual and legal settings. They contain language which seems to support HP's position but were evidently chosen without regard to any consistent overall view of the law. Most of the cases cited by the Defendant do not involve the issues presented by this motion and are distinguishable and inapplicable here. For example, *Marzano v CSC*  91 F.3d 497, 513-14 (3d Cir. 1996) is a Third Circuit case from 1996 which relates to the application of New Jersey discrimination law not federal law. It has nothing to do with the ADA or extraterritorial

application of federal discrimination laws. The point for which it is cited by HP is the standard for piercing the corporate veil under New Jersey corporations law and irrelevant to this case. *Johnson v. Flowers Indus., Inc*., 814 F.2d 978, 980-81 (4th Cir. 1987) was not brought under the statutes here and did not apply the four-part test. The decision in this case is based exclusively on corporate law and the limited liability of shareholders. The presumption against the liability of shareholders cited in the case is a matter of corporate law in the absence of a statutory provision to the contrary. This is not applicable to the instant case. *Nesbit v. Gears Unlim., Inc*., 347 F.3d 72, 84 (3d Cir. 2003) relates to the 15 employee jurisdictional minimum under Title VII. It has nothing to do with extraterritorial application of title VII or the ADA. It discusses the similar four-part test for single-employer status under the NLRA but that is dicta as the holding was on other grounds. *Frank v. U.S. West, Inc.,* 3 F.3d 1357, 1362 (10th Cir. 1993) this case has no issue of extraterritorial application and is a common law single employer case. Hence, the statute in question here was not applied. HP cites F*rank* for the proposition that control of labor relations is the only issue to be examined by the courts. However, the court in Frank made no such holding. Moreover, the *Frank* court, like HP here, seems to confuse the concept of piercing the corporate veil and underlying assumptions.

   *E.E.O.C. v. St. Francis Xavier Parochial School*, 928 F. Supp. 29 (D.D.C. 1996), rev'd on other grounds, 117 F.3d 621 (D.C. Cir. 1997) involved whether or not the employees of a church and a church school could be combined to meet the 15 employee minimum for coverage of Title VII. HP cites this for the proposition that only control of labor relations and, within that subject, only the identity of the challenged decision makers is pertinent. The court in this case made no such holding and indeed examined all of the aspects of the four-part test under Title VII common law. *Switalski v. Intern'l Ass'n of Bridge, Structural and Ornamental Iron Workers, Local Union No. 3*, 881 F. Supp. 205 (W.D.Pa. 1995) involved the 25 employee limit for application of the ADA. It had nothing to do with foreign corporations or extraterritorial application under Section 12112. HP cites this case for the proposition of that only issue is the employer of the decision maker. Not only did the court not make such a holding it expressly held as follows: "While all four criteria of the test need not be present in all cases and the presence of any single factor is not

conclusive, control over the elements of labor relations is a central concern. Citing *Armbruster v. Quinn*, 711 F.2d 1332, 1337 (6th Cir. 1983)."

*Trevino v. Celanese Corp*., 701 F.2d 397, 404 (5th Cir. 1983) There was no issue of the ADA or extraterritorial application. *Trevino* was a common law Title VII case. Moreover, HP cites *Trevino* for the proposition that application of the four-part test is limited to labor relations and the specifically to the issue of which company employed the decision makers. *Trevino* stands for no such proposition and actually stands for the opposite. In *Trevino* the court held that if the decision maker were employed by the parent company, this would be a critical factor.  As there was conflicting evidence as to whether the decision makers were employed by the parent or the subsidiary, the court reversed a grant of summary judgment. The language on which HP relies amounts to a holding that if the employee has substantial evidence that the decision maker was employed by the parent company, this is sufficient to avoid summary judgment on the separate employer issue. HP stands this holding on its head and cites it for the proposition that such evidence is the *only* evidence sufficient to establish single-employer status. Neither *Trevino* nor any other case so holds. *Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235 (2d Cir. 1995) is a gender discrimination case under Vermont antidiscrimination statutes. In addition, the court in *Cook* like the court in *Trevino,* held the opposite of the proposition for which HP cites it. *Cook* and T*revino* in fact stand for the flipside of this suggestion.

*Lusk v. Foxmeyer Health Corp*., 129 F.3d 773 (5th Cir. 1997) was an age discrimination case under the ADEA. It did not involve extraterritorial application or Section12112. The court relied on piercing the corporate veil presumptions against parent company liability. The court also use the analysis of quote excessive" control implying that something above and beyond the court normal" relationship between a parent and subsidiary must be shown. This is related to the corporate veil test. It is not applicable here as it is a common law case under a different statute.

*E.E.O.C. v. Chemtech Intern. Corp*., 890 F. Supp. 623 (S.D. Tex. 1995) involved the 25 employee minimum for application of the ADA. It was a common law decision and did not involve Section 12112. The court discussed the four-part test and ruled that the minimum number of employees was met without discussing the specific evidence presented. *Zysk v. FFE*

1   *Minerals USA, Inc*., 225 F.Supp.2d 482, 496 (E.D.Pa. 2001) Pennsylvania District Court age

2   discrimination case under the ADEA. This case does not involve extraterritorial application or

3   the statutes presented in this case. *Swallows v. Barnes & Noble Book Stores, Inc*., 128 F.3d 990

4   (6th Cir. 1997) involved an effort to make a single employer claim where one of the entities was

5   a state government entity. It has no application here. *Rogers v. Sugar Tree Prods., Inc*., 7 F.3d

6   577, 583 (7th Cir. 1993) issue was the number of employees for jurisdiction purposes.

7          HP does cite two cases that are, at least, on point. *Duncan v. American Intern'l Group,*

8   *Inc*., 2002 WL 31873465 (S.D.N.Y. Dec. 23,2002) and *LaBouve v. Boeing Co*387 F. Supp. 2d

9   845 (N.D. Ill. 2005). However, neither decision is very useful here. First, neither case appears to

10  involve any significant evidence to meet any of the four prongs of the statutory test. As the

11  Plaintiffs in these cases failed to produce evidence to meet the four elements of the test, their

12  claims were dismissed. For example, in Duncan the parent company had only a 20% interest in

13  the subsidiary and there was no indicia of day to day control. The district court in *Duncan* did

14  state that the employer of the decision maker was crucial. However that was against the

15  background of no other evidence and little legal authority. ("Moreover, [Plaintiff's] one-and-a-

16  half page memorandum of law fails to cite a single case or provide any compelling analysis as to

17  why AIG should be held accountable for AIC's employment actions").  Duncan cannot be

18  viewed as authority for the proposition that the four part test should be ignored in favor of a

19  single narrow factor. Similarly in *LaBouve* there was only a 25% ownership interest and no

20  evidence to meet the four factors. Thus, the result is not controlling here. To the extent that the

21  court looked to the common law for piercing the corporate veil it was simply improperly

22  engrafting those standards on the four factor test.

23          Respectfully submitted,

24                                          Dated this 7th _day of August, 2013

25

26                                          _____/s/_____

27                                          Karen E. Ford Esq.
                                            Attorney for Plaintiff
28