Karen E. Ford Esq.
SW Ocean Ave & Mission, Suite 208
P.O. Box 287
Carmel-by-the-Sea, California 93921-0287
831-250-6433
Fax 831-250-6844
karen@fordslaw.com
SBN 88358
Attorney for Plaintiff Peter Siegel

# United States District Court
# Northern District of California

Peter Siegel,

        Plaintiff,

      vs.

Hewlett-Packard Company,

        Defendant

)
)
)
)
)
)
)
)
)
)
)

Case No: 5:12-cv-03787 HRL_____

**NOTICE OF ERRATA AND
CORRECTION TO PLAINTIFF'S
MEMORANDUM OF POINTS AND
AUTHORITIES IN OPPOSITION OF
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

**TO THE COURT AND ALL OTHER PARTIES TO THIS ACTION:**

PLEASE TAKE NOTICE that Plaintiff Peter Siegel hereby provides notice of errata and correction as follows:

On August 7, 2013, Plaintiff filed his "Memorandum in Opposition to Motion for Summary Judgment Filed by Defendant Hewlett Packard." Plaintiff's counsel was unaware at the time of filing that several citations to evidence were incomplete. Plaintiff's counsel has added the correct evidence citations in the following locations: Page 4, Line 1; Page 4, Line 10; Page 5, Line 4; Page 5, Line 24; Page 6, Line 20; Page 7, Line 8; Page 7, Line 9; Page 7, Line 14; Page 8, Line 1; Page 8, Line 23; Page 9, Line 3; Page 9, Line 21; Page 12, Line 23; Page 12, Line 27; Page 19, Line 8; Page 19, Line 8. In addition, Plaintiff's counsel was unaware at the time of filing that an exhibit was not properly included in the "Memorandum in Opposition to Motion for Summary Judgment Filed by Defendant Hewlett Packard." Plaintiff's counsel has attached that document as Exhibit A to the "Memorandum in Opposition to Motion for Summary Judgment Filed by Defendant Hewlett Packard." A corrected version of the Plaintiff's "Memorandum in Opposition to Motion for Summary Judgment Filed by Defendant Hewlett Packard" with Exhibit A is attached hereto.

Respectfully submitted,

Dated this 9th _day of August, 2013

_____
/s/
Karen E. Ford Esq.
Attorney for Plaintiff

Karen E. Ford Esq.

SW Ocean Ave & Mission, Suite 208
P.O. Box 287
Carmel-by-the-Sea, California 93921-0287
831-250-6433
Fax 831-250-6844
karen@fordslaw.com
SBN 88358
Attorney for Plaintiff Peter Siegel

# United States District Court
# Northern District of California

| | | |
|---|---|---|
| Peter Siegel, | ) | Case No: 5:12-cv-03787 HRL_____ |
|     Plaintiff, | ) | |
| | ) | **MEMORANDUM IN OPPOSITION TO** |
|   vs. | ) | **MOTION FOR SUMMARY JUDGEMENT** |
| | ) | **FILED BY DEFENDANT HEWLETT** |
| Hewlett-Packard Company, | ) | **PACKARD [Errata]** |
| | ) | |
|     Defendant | ) | |
| | ) | |

Plaintiff Peter Siegel (Plaintiff or Siegel) hereby submits his initial opposition to the Motion for Summary Judgment (MSJ) filed by Defendant Hewlett Packard Company (HP). Plaintiff asserts that the MSJ must be denied as premature pursuant to Rule 56(d) of the Federal Rules of Civil Procedure because, despite diligent effort on his part, he has not yet had the opportunity to conduct necessary discovery. Plaintiff further opposes the MSJ on the grounds that 1) the undisputed evidence supports Plaintiff's legal position and 2) that there is evidence establishing disputes of fact as to the factual contentions raised by Defendant HP and 3) that the evidence presented by Plaintiff supports an order in favor of Plaintiff on the issues presented and 4) that HP has misstated the applicable legal standards. Plaintiff relies on the Declarations of Karen E. Ford (Ford Declaration) and Peter Siegel (Siegel Declaration) filed herewith; the Request for Judicial Notice filed herewith, the Motion to Strike filed herewith; the Complaint filed in this action and the record in this action as a whole.

## I.   The MSJ Should Be Denied Due to the Need for Further Discovery.

As set out in the Motion for Continuance with regard to the MSJ filed in this action on or about July 11, 2013 the declaration of Karen E. Ford in support of the Motion to Continue and the Ford Declaration filed herewith, Plaintiff is unable to respond fully to the MSJ because he has yet to complete discovery. It is anticipated that much of the information provided in opposition to the MSJ will be the subject of objection on such grounds as lack of foundation or speculation. However, if Plaintiff were permitted to complete discovery such problems could be cured. Plaintiff submits that he sought diligently to obtain the necessary discovery but it was not forthcoming from HP. For the reasons set forth herein and in the Motion to Continue the MSJ, Plaintiff requests that the MSJ be denied or continued until discovery can be completed pursuant to Rule 56(d) of the Federal Rules of Civil Procedure.

## II.   Background

It is undisputed that Siegel is a citizen of the US who was employed in the United Kingdom (UK) by HP and assigned to a wholly owned subsidiary of HP.  Prior to 2008 Siegel

1  was employed in the UK by a different US corporation, EDS, based in Plano, Texas.[1]  In 2008

2  EDS was acquired by HP and was merged into the HP organization. In March of 2009 Plaintiff

3  was in a traffic accident in which he suffered a permanent brain injury rendering him disabled.

4  Plaintiff contends that he was thereafter discriminated against and subjected to a hostile work

5  environment in violation of the Americans with Disabilities Act as a result of his disability or

6  because he was regarded as more disabled that he was. He also contends that his employer, in

7  further violation of the ADA failed and refused to accommodate his disability and failed or

8  refused to engage in an interactive process concerning his requests for accommodation. The sole

9  issue presented by the MSJ at issue is whether the ADA applied to Plaintiff's employment in the

10  UK. He left HP in March 2011.

**The HP Global Organization**

12        A key to understanding the flaws in the arguments raised by HP is an understanding of

13  the nature of the HP global organization. The MSJ contrasts HP operations in the US and HP

14  operations in the UK as if there were a division between the two and as if the UK operation

15  were limited to HP Enterprise Services UK Ltd.[2] The evidence, including countless admissions

16  by HP, indicates this is inaccurate. The evidence establishes that HP holds itself out and, in fact,

17  operates, as a single integrated global enterprise which includes numerous business entities. The

18  MSJ relies on references to Enterprise Services in HP's own evidence as if that refers

19  exclusively to HP Enterprise Services Limited UK and no other entity. The MSJ also contrasts

20  HP operations in the US and HP operations in the UK as if there were a division between the

21  two and as if the UK operation was limited to HP Enterprise Services UK. This is undeniably

22  inaccurate. The HP organization includes at least six to eight entities in the UK. The defendant

23  in this case is an integrated international business and the details of the every changing merry go

24  round of subsidiary entities it creates to suit its whim should not preclude liability in this case.

---

[1]  Prior to the merger with HP the UK subsidiary was owned and controlled by the parent company, Electronic Data
Systems (EDS), in Plano, Texas.  Thus, application of the ADA to Plaintiff's employment did not begin with the
merger with HP. He was always a US citizen employed abroad by a US company through a wholly owned and
controlled subsidiary.
[2]  Thus, HP presents evidence from employees of another of the entities in the global organization, HP Limited, in
support of the MSJ.

### III.   Summary of Pertinent Facts and Evidence

#### A.  Response to Undisputed Facts Relied on by HP

HP sets out the allegedly undisputed facts on which the Motion is based on pages 1 through 3 of its Motion. HP may not base its motion on factual allegations which are unsupported by evidence or as to which Plaintiff has produced contrary evidence. Plaintiff disputes the following factual contentions relied on by HP:

1.      "Siegel was hired by Electronic Data Systems Ltd. ("EDS Ltd.") in June 2006 to work in EDS Ltd.'s London office. Complaint, ¶ 8." HP page    Plaintiff disputes that this statement appears in the Complaint paragraph 8. The company name is not stated as EDS Ltd. and the location of London is not named. Plaintiff admits that he worked for the EDS global organization in the UK prior to the acquisition of the EDS global organization by HP.

2.      "At all relevant times, Siegel was either an employee of EDS Ltd. or an employee of HPES UK Ltd."  There is no evidentiary basis given for this statement and Siegel disputes it. (Siegel Declaration paragraph 3, format hereinafter "Siegel ¶ 3" )

3.      "HPES UK Ltd. (and before it EDS Ltd.) operates independently from HP during Siegel's employment and continues to operate independently today. No HP employees were involved in the day-to-day operations of HPES UK Ltd. or EDS Ltd. HPES UK Ltd."  Plaintiff disputes this statement and has presented extensive evidence that HP Enterprises Services UK Ltd is part of an integrated global organization including Hewlett Packard Company and subsidiaries worldwide. HP represents itself to customers and employees as a single integrated global organization. HP Enterprise Services UK Limited is not even able to operate independently. The annual reports filed with the UK government establish that it is financially dependent on HP and the other subsidiaries. Essential functions such as Human Resources, financial record keeping, administration, employee occupational health are assigned by HP to itself and to other HP subsidiaries which perform these functions on a global basis for many entities throughout HP. Plaintiff has presented extensive evidence of specific day to day control of his activities and decisions relating to him by HP through Hewlett Packard Company and other subsidiaries. Siegel ¶   4, 9, 10, 11, 12, 13, 14, 16, 19, 25, 26, 27, 30, 31 32, 33, 34, 35, 36,

37, 38, 39, and 40.   Ford Declaration paragraph (format hereinafter "Ford ¶") 5, 7, 15, 16, and 17.  Response to Request for Admissions by HP (hereinafter "Admission") 22, 23, 31, 32, 33, 40, 41, and 42.

       4.      "HPES UK Ltd. and EDS Ltd. made their own decisions as to hiring, discipline, and termination of their employees without involvement from HP."  Plaintiff disputes this and presents evidence on this point even in his own case. Seigel ¶ ¶ 9, 33, 34, 37, 40, 47, 48 and 49.

       5.      "At all relevant times, EDS Ltd. and HPES UK Ltd. operated their headquarters out of a building located in the UK." "EDS Ltd. and HPES UK, Ltd. also maintained their own office space in the UK, and leased office space under their own names." Plaintiff does not dispute that HP Enterprise Services UK Ltd had office space. However it was not exclusive to it and was shared with at least six other HP subsidiaries. Ford Exhibit C. Seigel ¶ 20. In addition, the rate payer and therefor the official occupier of the property is another subsidiary, Hewlett Packard Limited. Admission 31 and 32. In all probability, the lessor on the lease HP relies on is HP or one of its subsidiaries.

       6.      "EDS Ltd. and HPES UK, Ltd. determined bonuses and pay raises for their employees." Plaintiff disputes this and has submitted evidence that HP set compensation at the time of the acquisition of EDS to fit within its standards. Also, after the EDS acquisition the performance review system was merged into the HP electronic database and these matters were handled thereafter in accordance with the model dictated by HP. Finally, as an example of the external control, after the acquisition the CEO of Hewlett Packard reduced wages for EDS employees including those at HP Enterprise Services UK Ltd and its predecessor. Later a new CEO at Hewlett Packard increased the wages. Siegel ¶ 35 and 36.

       7.      "EDS Ltd. and HPES UK Ltd. maintained employment policies that are specific to employees in the UK. In fact, Siegel's Complaint even references the "UK / Sickness & Long Term Absence Policy."  Plaintiff disputes the generalized conclusory statement. In addition he specifically provides evidence and testimony that the sickness policy was set by HP to conform to its global standards.  Siegel  ¶ 10.

8.      "There is no overlap in the directors and officers of either EDS Ltd. or HPES UK Ltd on the one hand and the directors and officers of HP on the other hand." Plaintiff does not dispute that there were no directors of HP simultaneously serving as directors of HP enterprise Services UK Ltd. However, it is also true that there were frequent changes and transfers of directors. It is also true that the named directors of UK Ltd also simultaneously served as directors of numerous other subsidiaries of HP. Ford Exhibit E.

9.      "During his employment, Siegel communicated with Peter Parry, Andy Guile, John Waterfield, and Yvonne Ben Fredj regarding his injuries and accommodation requests." Plaintiff does not dispute that he communicated with these individuals. Plaintiff does dispute that these are the only persons he communicated with or that these were the only HP personnel involved in these matters.[3]   Siegel ¶ 11, 12, and 13.

10.      "No employee of HP played any role in handling Siegel's medical claims or requests for accommodations.  All decisions and discussions regarding Siegel's injuries and reasonable accommodations were made by employees of HPES UK Ltd. or its predecessor, EDS Ltd. Id. HPES UK Ltd. and EDS Ltd. employees did not consult HP before making those decisions." Plaintiff disputes this. As a matter of fact the evidence establishes that not only were individuals outside HP Enterprise Services UK Ltd consulted, they were often acting on their own with respect to Siegel's situation independent of UK Ltd.  Siegel ¶ 11.

11.      "Siegel admits that, "[t]he employment records relevant to [his] employment are maintained and administered in the UK." Complaint ¶ 4 (emphasis added). At all relevant times, HPES UK Ltd. and EDS Ltd., have maintained Siegel's employment records in the UK." This point is of marginal relevance. Control and not location is the issue.  However, discovery has shown that this allegation in the unsworn complain is inaccurate. The records disclosed in discovery by HP show that the employment records were kept electronically in centralized

---

[3]  Defendant HP appears to operating under the erroneous assumption that Plaintiff is not allowed to present facts or evidence not included in the complaint. However, Plaintiff is not limited to the precise facts stated in the complaint. Rule 8 of the Federal Rules of Civil Procedure states that the complaint must contain a "short and plain statement of the claim." Fed. R. Civ. P. 8. Under Rule 8, Plaintiff is not required to plead all the facts relating to the claim. Rather, the Plaintiff "is required only to give notice of the claim such that the opposing party may defend himself or herself effectively." *Starr v. Baca*,  633 F.3d 1191, 1201 (9th Cir.2011). Defendant can then utilize discovery mechanisms, such as interrogations, to ascertain more details regarding the complaint's allegations. *Remick v. Manfredy*, 238 F.3d 248  (3d Cir.2001). Accordingly, under Rule 8, Plaintiff must plead enough fact to raise reasonable expectation that discovery will reveal evidence to support allegations. Plaintiff has done so in this case, and is not bound to only those statements present in the complaint.

databases at HP. Moreover there were central HP websites established for various HR matters. Ford Declaration 8. Siegel ¶ 37. Admissions 26, 27, and 28.

12. "At all relevant times, Siegel performed his duties under the supervision, direction, and control of Parry, Guile, and Waterfield. EDS Ltd. and then HPES UK Ltd. alone determined the duties Siegel would perform, assessed his performance, paid his salary, and withheld his taxes. At no time did employees of HP have any authority to supervise, control, or direct Siegel's employment activities." Plaintiff admits that he was supervised by Parry and Waterfield. Guile was a manger to whom he did not report but who had management authority. Plaintiff presents extensive and powerful evidence to dispute that Parry and Waterfield were the only mangers who supervised, him and directed his work. He has proven that he was also under the direction supervision and control of managers from other parts of HP and even from executive s of Hewlett Packard Company in California. Siegel  ¶ 11, 14, 24, 25, 30, 31, 38, 42, 43, and 46.

13. "Siegel's own e-mail signature block indicates that he was an employee of "HP Enterprise Services Ltd." plaintiff disputes this. Siegel ¶ 23.

14. "Siegel's "P45" form1 reflects that HP Enterprises Services UK Ltd. was his employer at the time of his termination. Further, Siegel's paystub reflecting his supplementary payment for mileage upon termination lists his employer as HPES UK Ltd. This Supplementary Payment form states that should he have any questions he may contact Carol Seward, a member of HPES UK Ltd.'s Payroll Department." Plaintiff disputes the conclusions HP seeks to draw from these records and presents other records which refute these conclusions. Siegel ¶ 21 and Exhibit Q.

### B.  Plaintiff's facts and evidence in support of ADA Liability.

Plaintiff has filed herewith abundant evidence in each of the four areas identified by the statute. Given the page limitation it is impossible to list in detail all of the evidence presented in this document. However, the following sets out the key areas of evidence presented.

### 1.  Interrelation of Operations

HP operates as a single, integrated global organization. The annual reports filed by HP with the SEC indentify the company and its subsidiaries as a single integrated whole. It describes itself as a single global organization. This description includes its subsidiaries including HP Enterprise Services UK Ltd which it contends employed Plaintiff.[4] The employee compliment figures for HP set out in its annual report admittedly include the employees of the subsidiaries including HP Enterprise Services UK Ltd. Admission 22. The consolidated financial statements in the annual report to shareholders also include the financial of HP Enterprise Services UK Ltd. Admission 23. In fact, 63% of HP's revenues come from outside the US through its foreign subsidiaries. Annual report p 23.

The press releases and annual reports to the UK and US government presented herewith as evidence emphasize the integrated global nature of the operation. See exhibits J, K, L, and M to Ford declaration, Admissions 12, 16, 19, 20, 21, 23, 24, 25, 34, 35, 37, 38, 44, and 45, and related exhibits. The transcript of testimony by a top financial officer with Hewlett Packard before a Senate committee (Judical Notice Exh.A) emphasizes the integrated global operation.

Ethical, environmental, rights of employees and the disabled, and other issues of global corporate citizenship are handled for all the subsidiaries including UK Ltd are handled centrally by HP. See Global Citizenship Report Ford ¶11 Exhibit I. As the 2008 annual report filed in the UK by HP Enterprise Services UK Ltd states

> "Hewlett-Packard Company, for which HP Enterprise Services UK Limited is a subsidiary, publishes an annual corporate responsibility report where detailed company wide environmental commitments, initiatives and key performance indicators can be found."

HP divides its operation into multiple "business segments" one of which is Enterprise Business. These business segments operate across corporate entity lines within the HP organization.  Enterprise Business specializes in very large corporate customers that normally enter into global or multinational contracts. Enterprise Services refers to the part of Enterprise Business which provides IT services as opposed to other products such as hardware. See Siegel ¶ 4, 5, 17, 23, and 24 and annual Report filed by HP with the SEC for the year 2011 on page 4, 11,

---

[4]  The statements in the filings constitute admissions of a party and are binding on HP.  Federal Rule of Evidence 801(d)(2)

12. HP Enterprise Services UK Ltd is part of the Enterprise Business/Enterprise Services along with many other subsidiaries worldwide and parts of Hewlett Packard Company. Enterprise Business and Enterprise Services is headed by Ann Livermore, a top level executive in Hewlett Packard Company. Siegel ¶ 14 and Ford Declaration Exhibit H Annual Report.  Enterprise Business and Enterprises Services operate globally and incorporate employees and operations of many subsidiaries. The HP 2011 annual report on page 25 states that the services segment of the business in which Plaintiff Seigel was engaged is an increasing segment of HP's business. Thus, the activities of Plaintiff and other employees of HP Enterprise Services Limited UK are not separate or tangential to the operations of HP. They are a critical core function of HP and a major source of revenue.

In 2008 HP acquired another global company, EDS based in the US in Plano Texas. At the time of the acquisition Siegel was employed by EDS. For about two years after the acquisition HP made huge changes in the organization and operation of the former EDS. This included changing job titles, job roles, compensation, benefit plans, policies and procedures to merge the EDS workforce with HP and to establish HP norms in all these areas. Siegel ¶ 2, 4, 9, 10, 33, 34, 35, 36, 37, 39, and 49. HP reduced the workforce substantially and transferred employees to other parts of the HP organization or laid them off. In other cases HP employees have been transferred into UK Ltd. All these organizational decisions were made by HP and not on the local level. On page 28 the annual report describes the workforce restructuring after the acquisition and merger of EDS into HP. The statement in the report admits that HP controlled and conducted this restructuring. The other annual reports include the same or similar statements.

As part of this restructuring HP set up a day to day operation in which fundamental business functions such as leasing real estate, human resources, processing expense reports, maintaining employee records, maintaining time records, banking, government filings, occupational health and safety were handled by specialized subsidiaries. Seigel ¶16, 19, and 41. HP Enterprise Services UK Ltd annual report, Ford Declaration Exhibit H. HP Enterprise Services UK Ltd relies on Hewlett Packard to handle its treasury functions and its relies on Hewlett Packard Company and its other subsidiaries for funding through loans and other devices.

Plaintiff has sought depositions of the witnesses who gave declarations in support of the MSJ to explore these interrelationships and establish evidence on this point. However, to date Plaintiff has not been able to take the depositions.

There are regular transfers of employees between subsidiaries. In such transfers the formalities of which subsidiary an employee works for are largely ignored. See Siegel ¶ 29 and 45, Exhibit V. Another example  of interrelated operations is the fact that there is a single central American Express log in page for HP organization employees regardless of subsidiary affiliation to log into to conduct business concerning company credit cares. Admission 30.

The day to day operations involved providing services to customers who had agreements with HP that were global in scope and required interrelated providing of goods and services from many different subsidiaries under the supervision and at the direction of HP. These contracts required integrated day to day operations described below. Plaintiffs have sought copies of the agreements and other information concerning billing and other financial aspects to show that this is handled on an integrated basis. However, to date Plaintiff has been denied such documents and information.

HP makes much of the fact that a lease exists for its office space on Cain Road in Bracknell. However, the lease it relies on is only the signature page and does not reveal the lessor. The tax rolls in the UK show that the occupier of the property is Hewlett Packard not HP Enterprise Services UK Ltd. HP admits that Hewlett Packard Limited is the taxpayer for the property. Admission 32.  Presumably the lessor is Hewlett Packard or possibly yet another subsidiary of HP. Plaintiffs have sought a full copy of the lease from HP but it has not been produced. As Exhibit C to the Ford Declaration shows, HP lists at least six subsidiaries at that address. Mr. Siegel reports that he has been to the office building and the employees of all the companies work in un-segregated spaces. No one walking though the office would be able to tell which employee worked for which company. The space is completely integrated and the activities of the employees interrelated.

The declarations submitted by HP are actually excellent evidence of this interrelationship. Three of the four witnesses, Johnson, Sales, and Wildish do not work for HP Enterprise Services UK Ltd. Each of those three describes his or her functions and admits to performing tasks essential to the operation of the subsidiary. They also claim intimate knowledge of these functions within the subsidiary as a result of their jobs. The truth is that UK Ltd is a shell which cannot operate independently.  It has no ability to perform these tasks such as banking, real estate and administration on its own. These functions are performed by other parts of the integrated whole.

### 2.  Common Management

Plaintiff asserts that HP exercises day to day management with respect to HP Enterprise Services UK Ltd and its employees. Although he has been denied any discovery on this point, he has presented evidence in support of this operation. Regular directions and communications to him from HP in the US are described in Siegel's declaration paragraphs 38, 25 and the exhibits thereto. The exhibits show e mail communications from the highest levels within HP to Mr. Siegel. However he has been denied copies of all e mails sent to him and by him while employed at HP on the grounds they would be irrelevant. There would be many more e mail communications showing direct control over Seigel from HP in the US. Further, presumably there are similar communications to and from other managers at HP Enterprise Services UK Ltd but none have been provided.

The following facts relate to both interrelation of operations and common management. The normal day to day operations at HP Enterprise Services UK Ltd involved working on teams established by HP on a client by client basis for the most part these were not clients based in the UK and virtually all were international in scope. The teams were made up of individuals from different subsidiaries and from Hewlett Packard. As a management member of such teams, and specifically in the role of Chief technology Officer Mr. Siegel regularly received supervision and direction from managers employed by HP in the US. Siegel ¶ 38 and exhibits thereto. He also routinely on a day to day basis supervised and directed the work of employees of companies in

the HP organization outside of HP Enterprise Services UK Ltd. For example, in the case of Aon

Insurance, the last customer Mr. Siegel was assigned to and for whom he worked in 2010 and

2011, the customer was a global company based in the US.  One of the employees assigned to

report to Mr. Siegel on the team was Tim Stephenson who did not work for HP Enterprise

Services UK Ltd but for another subsidiary. Siegel ¶43. The team was headed by Sean Wells, the

Global Account Executive representing HP on the Aon account and based in US. He "owned"

the account within HP. As the Chief Technical Officer on the team Siegel worked under Mr.

Wells and received direction from him. Ian Oldfield, another manager on the team was Siegel's

day to day supervisor with respect to the Aon account. Oldfield worked in the EMEA business

group and his e-mail signature line indicates he did not work for HP Enterprise Services UK

Limited. (See Siegel Exhibit M) Another manager on the team, Tom Rebecca, was HP's US

account executive for Aon.  He worked for HP in the US and did not work for HP Enterprise

Services UK Ltd.  Siegel also received direction from him concerning the Aon account. There

was also an HP "executive sponsor" for the Aon account (see slide 22 showing the responsible

team members for HP and Aon in each area of the world) and his name was John McMullen. He

was the Senior Vice President and Treasurer for Hewlett Packard Company in California. The

executive sponsor on an HP global team is responsible for meeting with the client and they serve

as the ultimate escalation point for direction and supervision on the account. In normal HP

practice the person in Sean Wells' position would provide regular reports and updates to Mr.

McMullen and directives would have come down from McMullen to Wells which would be

communicate to the rest of us on the team. The Aon team described was the typical way in which

the teams for the international clients I worked on were constituted and functioned on a day to

day basis.  Siegel ¶ 25.

### 3.  Centralized Control of Labor Relations

Plaintiff has presented extensive evidence of centralized control of labor relations. This

includes HP setting compensation, job titles, roles, HR policies. Mr. Siegel's Job title was

changed as were the policies that related to his employment. These changes were made by HP to

conform to the HP standard. As the 2008 annual report filed by HP Enterprise Services UK states:

> Hewlett-Packard Company, for which HP Enterprise Services UK Limited is a Subsidiary, publishes an annual corporate responsibility report where detailed company wide employee commitments, initiatives and key performance indicators can be found. See Global Citizenship report attached to Ford Declaration.

HP has a central website for Hewlett Packard which has a job application portal. In using the portal it is impossible to see any distinction for separate subsidiaries. Hewlett Packard centrally accepts applications for employment

After the acquisition HP promulgated a global program under which employees were to give back a percentage of their salary.   This applied globally to the subsidiaries in the HP organization. It applied to employees assigned to HP Enterprise Services UK Ltd. This was put in place by HP CEO Nick Hurd. Later, the new CEO of  HP, Leo Apotheker, ordered reimbursement to affected employees. This is an example of direct control of compensation of HP Enterprise Services UK Ltd employees by the top management of HP. Siegel paragraph 36

HP has a Global Ethnics group which is part of Hewlett Packard. The Global Ethics group sets ethical standards for employees of the HP organization which are applicable worldwide across all the subsidiaries including HP Enterprise Services UK Ltd. Employees of all the subsidiaries including HP Enterprise Services UK Ltd. are not only expected to follow the rules which amount to employment rules or policies, they are invited to report any violations to the central Global ethics office. If there is suspected ethical breaches anywhere in the HO organization across all the subsidiaries, Global ethics is empowered to and does conduct investigations of employee misconduct and take or effectively recommend action. Plaintiff has sought to take the deposition of the head of the Global ethics group and otherwise obtain discovery concerning the activities of this group but this has been denied. This discovery would yield further evidence. See Global citizenship report, Ford Exhibit I pages 18-21.

In another example, an HR person from HP in the US, Cynthia Pye, came to HP Enterprise Services UK Ltd to oversee the transition of customer employees who were being transferred

into UK Ltd. she controlled assignments, roles, titles and reporting and she trained the employees. In fact she specializes in doing this for HP in its subsidiaries worldwide.  Siegel ¶30.

HP makes much of the fact that there is a UK policy concerning long term illness. A copy of the policy is attached to the Siegel Declaration. The footer on the last page of the policy reflects that it was set by Hewlett Packard after the acquisition to meet HP standards. It is an HP policy and is evidence of centralized control.

### 4.   Common Ownership or Financial Control

It is not disputed that HP holds a 100% ownership interest in HP Enterprise Services UK Ltd. However, the evidence in this area does not end there. It is worthy of note that the witness for HP in connection with this motion concerning financial matters for HP enterprise Services UK Ltd. is an employee of a different subsidiary. Presumably this is because these financial functions of UK Ltd are performed by a different part of the HP organization.  The 2008 annual report filed by UK Ltd with the government of the UK states on page 16:

> Treasury policy
>
> Hewlett-Packard Company, the ultimate parent company, has a centralised treasury function which manages the overall group's Treasury policy and requirements….The company finances its operation by a mixture of short and long term loans from Hewlett-Packard Company subsidiaries and capital markets.
>
> Foreign currency risk
>
> The company borrows and holds cash balances in both Sterling and US Dollars Hewlett-Packard Company's centralised treasury function manages foreign currency risk for the wider group, including HP Enterprise Services UK Ltd.

This financial reliance and looking to HP for financial support in the form of loans or otherwise shows financial interrelationship and financial control by HP. Plaintiff has also sought discovery in this area including the deposition of the financial witness for HP in this motion. However, to date this discovery has been denied.

### 5.   Individual conduct concerning Siegel and his claims in this case.

In addition to the forgoing evidence meeting the statutory requirements, Plaintiff has presented the following evidence concerning challenged conduct and decisions at issue in this case which is directly attributable to managers and employees of HP entities other than HP Enterprise Services UK Ltd, including the overall parent, Hewlett Packard Company. There is not sufficient room to set all these out here but the declaration and exhibits thereto establish that HP was involved directly in the conduct and events complained of. They are set out more fully in paragraph 11 of the Siegel Declaration. The decisions in which individuals outside UK Ltd were involved included the removal of his home office equipment, the refusal of his request to keep the equipment as and accommodation, the failure or refusal to do an occupational health assessment, the failure to allow him to transfer and to assign him to another customer.

## IV.   Applicable Legal Standards

### A.  Standard for Denial of a Motion for Summary Judgment.

The standard for grant of summary judgment is stringent. Federal Rule of Civil Procedure 56(c) permits the Court to grant summary judgment only when there is no genuine issue of material fact and when the moving party is  entitled to judgment as a matter of law. *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 64 S. Ct. 724, 88 L. Ed. 967 (1944); Tee-Pak, Inc. v. St. Regis Paper Co., 491 F.2d 1193, 1195 (6th Cir. 1974). In deciding a Motion for Summary Judgment, the Court must construe evidence most favorably to the opposing party. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425, 427 (6th Cir. 1962).

In evaluating the record to determine whether there is a genuine issue as to any material fact, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [his] favor." *Anderson v. Liberty Lobby,* 477 U.S. at 255, 106 S. Ct. at 2513; *Chambers v. TRM,* 43 F.3d at 36; *Gallo v. Prudential*, 22 F.3d at 1223. The Court draws all inferences in favor of the nonmoving party only after determining that such inferences are reasonable considering all the evidence presented. See, e.g., *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir.), cert. denied, 484 U.S. 977, 108 S. Ct. 489, 98 L. Ed. 2d 487 (1987) If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from

which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM*, 43 F.3d at 37.

## B.  Standard for Extraterritorial Application of the ADA

The ADA applies to employment of a US citizen such as Plaintiff Siegel by a US company such as HP. 42 USC § 12111(4) provides "The term 'employee' [under the ADA] means an individual employed by an employer. With respect to employment in a foreign country, such term includes an individual who is a citizen of the United States." So it is undisputed that Mr. Siegel, as a US citizen employed in the UK, falls within the definition of an employee under the ADA. The question then becomes whether Mr. Siegel is "an individual employed by an employer" covered by the ADA.  The ADA provides very explicit standards for making this determination and this is admitted by HP in its Motion.   42 USC Sec. 12112 provides in pertinent part as follows:

> (c) Covered entities in foreign countries
> ….
> (2) Control of corporation
> (A) Presumption
> *If an employer controls a corporation whose place of incorporation is a foreign country, any practice that constitutes discrimination under this section and is engaged in by such corporation shall be presumed to be engaged in by such employer*.
> (B) Exception
> This section shall not apply with respect to the foreign operations of an employer that is a foreign person not controlled by an American employer.
> (C) Determination
> For purposes of this paragraph, *the determination of whether an employer controls a corporation shall be based on—*
> > *(i) the interrelation of operations;*
> > *(ii) the common management;*
> > *(iii) the centralized control of labor relations; and*
> > *(iv) the common ownership or financial control,*
> *of the employer and the corporation*. (emphasis added)

Thus, the standard for Plaintiff to prevail as to coverage of the ADA over his employment and liability of Hewlett Packard Company for its UK subsidiary HP Enterprise Services UK Ltd. and its predecessors is the four part test set out in 42 USC 12112(c)(2)(C). In bringing this

motion HP pays lip service to this statutory standard and then goes on to totally ignore it relying

almost exclusively on common law cases which do not interpret that provision.

The statutory standard set out above has its origins in federal common law developed

under the National Labor Relations Act and known as the single employer doctrine. The single

employer doctrine applies "in the case of two ongoing businesses which the NLRB wishes to

treat as a single employer on the ground that they are owned and operated as a single unit."

*NLRB v. Hosp. San Rafael*, 42 F.3d 45, 50 (1st Cir. 1994), cert. denied, 516 U.S. 927 (1995). The

motive of the employer is irrelevant to a single employer analysis. *Id*. The reality of the situation

is controlling. The Supreme Court has adopted the NLRB's four part single employer analysis,

identical to that set out in Section 12112(c)(2)(C). *Radio & Television Broadcast Technicians*

*Local Union v. Broadcast Serv., Inc.*, 380 U.S. 255 (1965) *Prairie Constr. Co. v. Int'l Union of*

*Operating Engineers* (Peter Kiewit) 425 U.S. 800 (1976) affirming in relevant part *Local No.*

*627, Operating Engineers v. NLRB* 518 F.2d 1040 (1975).  In *Radio Union v. Broadcast Service*,

the Supreme Court, in a *per curiam* opinion affirming a "single employer" holding below, held:

> "The controlling criteria [for single employer status] are
> interrelation of operations, common management, centralized control of
> labor relations and common ownership."

All four criteria need not be present in all cases and, even when no evidence of common

control of labor relations policy is presented, the circumstances may be such that the single-

employer doctrine is applicable. See *Metropolitan Detroit Bricklayers v. J.E. Hoetger & Co.*,

672 F.2d 580, 584 (6th Cir. 1982);  *Local No. 627, Operating Engineers v. NLRB*, 171 U.S. App.

D.C. 102, 518 F.2d 1040, 1045-46 (1975), aff'd in relevant part sub nom. *South Prairie*

*Construction Co. v. Local 627, Operating Engineers*, 425 U.S. 800, 48 L. Ed. 2d 382, 96 S. Ct.

1842 (1976)

The NLRB's single employer standard has been given effect by the Ninth Circuit. *Sakrete*

*of Northern California, Inc. v. NLRB*, 332 F.2d 902 (9th Cir. 1964)  cert. denied, 379 U.S. 961,

85 S. Ct. 649, 13 L. Ed. 2d 556 (1965), *A. M. Andrews Co. of Oregon v. N.L.R.B.*, 9 Cir., 236

F.2d 44. In *NLRB v. Welcome-American Fertilizer Company*  443 F.2d 19, 20 (9th cir 1971),

relied upon by HP in its brief, the Ninth circuit held as follows:

The principal factors which the Board weighs in deciding whether sufficient integration exists to treat separate concerns as a single employer are:

1. Interrelation of operations;

2. Centralized control of labor relations;

3. Common management; and

4. Common ownership or financial control.

*Radio & Television Broadcast Technicians Local Union v. Broadcast Service of Mobile, Inc.*, 380 U.S. 255, 85 S. Ct. 876, 13 L. Ed. 2d 789 (1965). **No one of these factors is controlling**, but emphasis is placed on the first three, as they tend to show operational integration. *Sakrete*, supra.

In *Sakrete* the only evidence of control by the parent company was at the top level and the Ninth Circuit found:

[E]ven if the substantial evidence shows interrelationship of operations, centralized control of labor relations, or common management only at the executive or top level, we do not agree that this precludes application of the "single employer" concept. … no other reason is suggested or occurs to us why mutuality of control at the local level must be shown. Seldom would it be practicable for two companies situated in different parts of the country to be managed at the local level by one man or management group. If there is overall control of critical matters at the policy level, the fact that there are variances in local management decisions will not defeat application of the 'single employer' principle." 332 F.2d at 907

In *Sakrete Of Northern California, Inc. And Freight, Construction, General Drivers And Helpers, Local 287* 137 N.L.R.B. 1220 (1962), the decision of the NLRB affirmed by the Ninth Circuit in Sakrete and cited with approval and followed by the Supreme Court in *Radio & Television Broadcast Technicians*, the NLRB discussed the evidence which can be used to meet each of the four criteria:

Conventionally, Board determinations finding functional integration between nominally separate business firms reflect the Agency's consideration of testimonial or documentary evidence regarding: (1) Shared or leased premises, facilities, or equipment (2) shared, or freely interchanged,

managerial, clerical, or production workers; (3) substantial reliance by one firm upon services provided by the other or (4) one firm's status as a regular user, manufacturer, processor, transporter, or handler of goods or materials provided by the other firm, either as part of some "straight-line operation" or some unified production effort.

Board decisions note "centralized control of labor relations" frequently as a significantly determinative factor in determinations regarding the presence of operational integration between separate concerns sufficient to warrant their treatment as a single employer for jurisdictional purposes. Record evidence normally considered relevant to such determinations may reflect: (1) responsibility for decisions with respect to labor relations matters delegated to a single management official or department ; (2) centralized management decisions regarding wage rates, work schedules, fringe benefit programs, and other working conditions, promulgated and effectuated without distinction between similarly situated employees of two or more separate concerns; or (3) centralization of hiring, discharge, and personnel record functions for separate concerns. No cases have come to my attention wherein control of labor relations matters for separate concerns was found sufficiently centralized merely because policy determinations with respect to such matters were made by a single management official without proof that such determinations--nominally made for separate  business enterprises--revealed some degree of coordination or deliberate parallelism.

Conventionally, Board  determinations finding "common management" present as a factor revelatory of significant integration, affecting two business enterprises nominally distinguishable, have rested upon record evidence that: (1) some single management representative or managerial group routinely supervises daily operations; (2) one accounting department or firm of auditors provides unified or centrally directed accounting or auditing service; (3) centralized or common facilities are provided for the purchase and distribution of mutually required equipment materials and supplies. At 1227-1228.

Plaintiff here presents substantial and irrefutable evidence on most of these points.

### C.  The Title VII Single Employer Doctrine Does Not Control Here

In recent years, some courts have applied concepts from the NLRB single employer doctrine to develop federal common law pursuant to various other employment law statutes. *Sharpe v. Jefferson Distrib. Co.*, 148 F.3d 676, 678 (7th Cir. 1998) However, this has been a matter of common law and not a statutory mandate. More important, the exact test or analysis of what constitutes a "single employer" has varied from court to court and statute to statute. The test under the WARN Act might be different that that under Title VII for example. These varied

1   tests may, or may not, apply the NLRB's four part test. In fact, the courts even use the term

2   "Title VII single employer doctrine" thus distinguishing it from the NRLB single employer

3   doctrine.  See *Armbruster v. Quinn*, 711 F.2d 1332, 1337-1338 (6th Cir. 1983) overruled on

4   other grounds 546 U.S. 500. Thus, it is clear that a common law doctrine has been developed

5   under Title VII and other statutes which bears the same name but is often distinct from the

6   original four part NLRB single employer doctrine. As can be seen from the somewhat scattered

7   decisions relied upon by HP, some courts have adopted some parts of the NLRB test and not

8   others. Other courts have looked to the traditional concepts of piercing the corporate veil and the

9   like either as an alternative to or in place of the four part test for a single employer.[5] HP relies on

10  a scattering of selected decisions from varied jurisdictions and arising in varied circumstances.

11  The decisions do not represent a coherent picture of the state of the single employer doctrine and

12  ignore the vast differences between the courts to have considered the matter.  In any event, all of

13  these common law tests are inapplicable here. The claim here rests squarely on a specific

14  statutory test drawn from the NLRB doctrine.  See EEOC guidelines attached as Exhibit A.

15      The Title VII common law single employer doctrine on which HP relies is applied where

16  the question at issue is whether a violation of Title VII by one company in the US should be

17  liable for violations of Title VII by another US company. In such a situation, as some courts have

18  noted, the public policy concerns relating to piercing the corporate veil come into play. After all,

19  the employee can bring the claim against either company. However, Congress made a conscious

20  choice to provide an avenue for US citizens employed by foreign subsidiaries of a US company

21  to enjoy and enforced their rights under the ADA.  In the absence of application of

22  12112(c)(2)(C) Plaintiff Siegel would have no means to vindicate his rights under the ADA. The

23  history of the enactment of 12112 is set out in the EEOC guidelines for enforcement, a copy of

24  which is attached to as Exhibit A for the Court's convenience. In short, in the companion cases

25  of *EEOC v. Arabian American Oil Co*. and *Boureslan v. Arabian American Oil Co*., 499 U.S.

26

27  [5]  See eg *Lusk v. FoxMeyer Health Corp*., 129 F.3d 773 (5th Cir.1997) at 778 ("Only evidence of control suggesting a significant departure from the ordinary relationship between a parent and its subsidiary-domination similar to that which justifies piercing the corporate veil-is sufficient."); *Sargent v.McGrath*, 685 F. Supp. 1087, 1088-89 (W.D. Wis. 1988) ("In the absence of special

28  circumstances, a parent corporation is not liable for the Title VII and section 1981 violations of its . . . subsidiary."). Even a cursory reading of 12112(c)(2)(C) establishes that Congress intended a different test to apply under its provisions. The presumption under 12112 is that the parent company *is* liable for ADA claims involving the foreign subsidiary.

244, 111 S. Ct. 1227 (1991) ("Boureslan"), the US Supreme court held that Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., did not apply extraterritorially to regulate the employment practices of United States employers that discriminate against United States citizens abroad. In response, Congress enacted the changes at issue here which assured the application of Title VII and the ADA to US citizens employed abroad. The legislative history makes clear that the purpose of Section 109 was to respond to the *Boureslan* decision. Section 109 was expressly intended to "extend the protections of [Title VII and the ADA] to American citizens working overseas for American employers," 136 Congo Rec. 515,235 (daily ed. Oct. 25, 1991) (statement of Sen. Kennedy). The situation presented here falls squarely within this legislative purpose. This is exactly the situation that Congress had in mind in enacting 12112(c)(2)(C).

Thus, Congress has chosen the test to be applied and it chose the traditional four part test developed under the NLRA. It also chose to specifically address the issue presented where a US company owns a foreign subsidiary and employs US citizens through that foreign subsidiary. Common law decisions under Title VII and other employment statutes are irrelevant to the instant case because the only test that can be applied here is the one set out in the statute. The only decisions that could be controlling would be those decided under the applicable statutory standard. Moreover, only decisions which fully apply the four part standard can serve as even persuasive authority.

## V.    The Legal Standard on Which HP's Motion Rests Is In Accurate.

The fundamental basis for HP's motion is the contention that in order to establish the requisite control by HP over HP Enterprise Services UK Limited, Plaintiff has to produce evidence that managers employed by HP made the precise decisions and engaged in the conduct which forms the basis of the lawsuit. This completely misstates the applicable standard, even under the cases on which it relies, and flies in the face of the clear statutory language. [6] HP also suggests that Plaintiff must show that there is something atypical or unusual about the relationship between Hewlett Packard Company and its subsidiaries as opposed to common

---

[6]   Of course, Plaintiff has submitted extensive evidence that the exact decisions and conduct challenged here were either undertaken by HP management outside of HP Enterprise Services UK Ltd.  or that individuals outside of HP Enterprise Services participated in the challenged decisions and conduct. See e.g. Siegel Declaration Paragraph 11.

operating practice between a parent company and subsidiary. However, this standard appears

nowhere in the statute at issue and is not even part of the Ninth Circuit's view of the Title VII

single employer doctrine. The idea is drawn from some of the decisions from other circuits and

other circumstances where ideas of piercing the corporate veil have crept into the analysis. It has

no application here and cannot be used to vary the statutory test.

Section 12112 clearly sets out four factors for a finding in favor of Plaintiff and none of

these factors is that the decision maker in the challenged decision must be employed by the

parent company. HP asks this court to ignore the plan language of 12112 and to adopt a more

narrow standard which does not appear anywhere in the statutory language.  The Supreme Court

held in *Bickford v. United States*, 228 Ct. Cl. 321, 326  (1981)

        Courts should "respect the most fundamental of all canons of statutory
construction: that statutes mean what they plainly say. As Chief Justice
Marshall stated more than a century and a half ago:

        The intention of the legislature is to be collected from the
words they employ. Where there is no ambiguity in the words there is
no room for construction. The case must be a strong one indeed, which
would justify a court in departing from the plain meaning of words . . .
in search of an intention which the words themselves did not suggest.
[Emphasis added.] *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76,
95-96 (1820).

    In sum, nothing suggests that Congress either expressly provided or intended for
[the statute at issue] to apply more narrowly than its literal language.

The Ninth Circuit applies this cannon of statutory construction as well. *United States v.*

*King*, 244 F.3d 736, 740 (9th Cir. 2001) ( "Unless the plain meaning leads to an absurd or

unreasonable result, which it does not here, our 'judicial inquiry is at an end.'" (citation omitted));

see also *United States v. Gonzales*, 520 U.S. 1, 8, 117 S. Ct. 1032, 137 L. Ed. 2d 132 (1997)

("Where there is no ambiguity in the words, there is no room for construction. The case must be

a strong one indeed, which would justify a court in departing from the plain meaning of words . .

. in search of an intention which the words themselves did not suggest." (internal citation and

quotation marks omitted)). In *United States v. Trapilo*, 130 F.3d 547, 551 (2nd cir 1997)  the

court analyzed this issue as follows: "The intention of the legislature is to be collected from the

words they employ. Where there is no ambiguity in the words, there is no room for construction.

The case must be a strong one indeed, which would justify a Court in departing from the plain meaning of words . . . in search of an intention which the words themselves did not suggest." Quoting *United States v. Wiltberger*, 18 U.S. 76, 95-96, 5 L. Ed. 37 (5 Wheat.) (1820) (Marshall, C.J.).

Thus, HP's assertion that the four part test set out in the statute should be disregarded in favor of a much narrower standard is without merit. It is worthy of note that HP cites no decision from the Ninth circuit concerning the Title VII single employer doctrine. As discussed above, the circuits have established differing standards on this point.  It is worthy of note that, given the inconsistent positions taken by the various courts, HP has chosen not to rely on 9th circuit precedent. In the Ninth circuit it is established that the single employer doctrine under Title VII is identical to the NLRB. See *Childs v. Local 18, International Brotherhood of Electrical Workers*, 719 F.2d 1379.  Thus, even if the Title VII single employer doctrine were applicable, the test in the Ninth circuit is the four part NLRB test and related precedent. It is not piercing the corporate veil or the more limited view of another circuit.

**VI.    The Decisions On Which HP Relies Are Distinguishable And Do Not Apply**

Many of the decisions on which HP relies involve situations where, unlike here, there was no evidence to show control of the subsidiary by the parent company. Thus, HP relies on the result without examining the overall level of evidence produced. Some of the decisions point out that the challenged decisions were made without evidence of input from the parent company. However, these cases are not authority for the proposition that such evidence is essential to Plaintiffs case or that the four part statutory test should be abandoned.  HP has cited a number of decisions for the proposition that the employing entity of the alleged wrongdoer is the only pertinent issue when the decisions make no such holding. As the Plaintiff here has presented abundant specific evidence meeting the statutory standard, grant of summary judgment would be improper.

HP seems to have chosen a scattering of decisions from various jurisdictions and involving varied factual and legal settings. They contain language which seems to support HP's position but were evidently chosen without regard to any consistent overall view of the law.

Most of the cases cited by the Defendant do not involve the issues presented by this motion and are distinguishable and inapplicable here. For example, *Marzano v CSC* 91 F.3d 497, 513-14 (3d Cir. 1996) is a Third Circuit case from 1996 which relates to the application of New Jersey discrimination law not federal law. It has nothing to do with the ADA or extraterritorial application of federal discrimination laws. The point for which it is cited by HP is the standard for piercing the corporate veil under New Jersey corporations law and irrelevant to this case. *Johnson v. Flowers Indus., Inc*., 814 F.2d 978, 980-81 (4th Cir. 1987) was not brought under the statutes here and did not apply the four-part test. The decision in this case is based exclusively on corporate law and the limited liability of shareholders. The presumption against the liability of shareholders cited in the case is a matter of corporate law in the absence of a statutory provision to the contrary. This is not applicable to the instant case. *Nesbit v. Gears Unlim., Inc*., 347 F.3d 72, 84 (3d Cir. 2003) relates to the 15 employee jurisdictional minimum under Title VII. It has nothing to do with extraterritorial application of title VII or the ADA. It discusses the similar four-part test for single-employer status under the NLRA but that is dicta as the holding was on other grounds. *Frank v. U.S. West, Inc.,* 3 F.3d 1357, 1362 (10th Cir. 1993) this case has no issue of extraterritorial application and is a common law single employer case. Hence, the statute in question here was not applied. HP cites F*rank* for the proposition that control of labor relations is the only issue to be examined by the courts. However, the court in Frank made no such holding. Moreover, the *Frank* court, like HP here, seems to confuse the concept of piercing the corporate veil and underlying assumptions.

E.E.O.C. v. St. Francis Xavier Parochial School*, 928 F. Supp. 29 (D.D.C. 1996), rev'd on other grounds, 117 F.3d 621 (D.C. Cir. 1997) involved whether or not the employees of a church and a church school could be combined to meet the 15 employee minimum for coverage of Title VII. HP cites this for the proposition that only control of labor relations and, within that subject, only the identity of the challenged decision makers is pertinent. The court in this case made no such holding and indeed examined all of the aspects of the four-part test under Title VII common law. *Switalski v. Intern'l Ass'n of Bridge, Structural and Ornamental Iron Workers, Local Union No. 3*, 881 F. Supp. 205 (W.D.Pa. 1995) involved the 25 employee limit for application of the

ADA. It had nothing to do with foreign corporations or extraterritorial application under Section 12112. HP cites this case for the proposition of that only issue is the employer of the decision maker. Not only did the court not make such a holding it expressly held as follows: "While all four criteria of the test need not be present in all cases and the presence of any single factor is not conclusive, control over the elements of labor relations is a central concern. Citing *Armbruster v. Quinn*, 711 F.2d 1332, 1337 (6th Cir. 1983)."

*Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir. 1983) There was no issue of the ADA or extraterritorial application. *Trevino* was a common law Title VII case. Moreover, HP cites *Trevino* for the proposition that application of the four-part test is limited to labor relations and the specifically to the issue of which company employed the decision makers. *Trevino* stands for no such proposition and actually stands for the opposite. In *Trevino* the court held that if the decision maker were employed by the parent company, this would be a critical factor.  As there was conflicting evidence as to whether the decision makers were employed by the parent or the subsidiary, the court reversed a grant of summary judgment. The language on which HP relies amounts to a holding that if the employee has substantial evidence that the decision maker was employed by the parent company, this is sufficient to avoid summary judgment on the separate employer issue. HP stands this holding on its head and cites it for the proposition that such evidence is the *only* evidence sufficient to establish single-employer status. Neither *Trevino* nor any other case so holds. *Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235 (2d Cir. 1995) is a gender discrimination case under Vermont antidiscrimination statutes. In addition, the court in *Cook* like the court in *Trevino,* held the opposite of the proposition for which HP cites it. *Cook* and T*revino* in fact stand for the flipside of this suggestion.

*Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773 (5th Cir. 1997) was an age discrimination case under the ADEA. It did not involve extraterritorial application or Section12112. The court relied on piercing the corporate veil presumptions against parent company liability. The court also use the analysis of quote excessive" control implying that something above and beyond the court normal" relationship between a parent and subsidiary must be shown. This is related to the corporate veil test. It is not applicable here as it is a common law case under a different statute.

*E.E.O.C. v. Chemtech Intern. Corp*., 890 F. Supp. 623 (S.D. Tex. 1995) involved the 25 employee minimum for application of the ADA. It was a common law decision and did not involve Section 12112. The court discussed the four-part test and ruled that the minimum number of employees was met without discussing the specific evidence presented. *Zysk v. FFE Minerals USA, Inc*., 225 F.Supp.2d 482, 496 (E.D.Pa. 2001) Pennsylvania District Court age discrimination case under the ADEA. This case does not involve extraterritorial application or the statutes presented in this case. *Swallows v. Barnes & Noble Book Stores, Inc*., 128 F.3d 990 (6th Cir. 1997) involved an effort to make a single employer claim where one of the entities was a state government entity. It has no application here. *Rogers v. Sugar Tree Prods., Inc*., 7 F.3d 577, 583 (7th Cir. 1993) issue was the number of employees for jurisdiction purposes.

HP does cite two cases that are, at least, on point. *Duncan v. American Intern'l Group, Inc*., 2002 WL 31873465 (S.D.N.Y. Dec. 23,2002) and *LaBouve v. Boeing Co*387 F. Supp. 2d 845 (N.D. Ill. 2005). However, neither decision is very useful here. First, neither case appears to involve any significant evidence to meet any of the four prongs of the statutory test. As the Plaintiffs in these cases failed to produce evidence to meet the four elements of the test, their claims were dismissed. For example, in Duncan the parent company had only a 20% interest in the subsidiary and there was no indicia of day to day control. The district court in *Duncan* did state that the employer of the decision maker was crucial. However that was against the background of no other evidence and little legal authority. ("Moreover, [Plaintiff's] one-and-a-half page memorandum of law fails to cite a single case or provide any compelling analysis as to why AIG should be held accountable for AIC's employment actions").  Duncan cannot be viewed as authority for the proposition that the four part test should be ignored in favor of a single narrow factor. Similarly in *LaBouve* there was only a 25% ownership interest and no evidence to meet the four factors. Thus, the result is not controlling here. To the extent that the court looked to the common law for piercing the corporate veil it was simply improperly engrafting those standards on the four factor test.

1

Respectfully submitted,

2

3
Dated this 9th _day of August, 2013

4

5
_____/s/_____

6
Karen E. Ford Esq.
Attorney for Plaintiff

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

The U.S. Equal Employment Opportunity Commission

| | | number |
|---|---|---|
| EEOC | NOTICE | 915.002 |
| | | 10/20/93 |

1. SUBJECT. Enforcement Guidance on Application of Title VII and the Americans with Disabilities Act to Conduct Overseas and to Foreign Employers Discriminating in the United States.

2. PURPOSE. This document is intended to provide guidance on two issues: the extraterritorial application of Title VII and the Americans with Disabilities Act to American and American-controlled employers abroad; and the coverage under both statutes of foreign employers discriminating within the United States.

3. EFFECTIVE DATE. On issuance.

4. EXPIRATION DATE. As an exception to EEOC Order 205.001, Appendix B, Attachment 4, § a(5), this Notice will remain in effect until rescinded or superseded.

5. ORIGINATOR. Title VII/EPA Division, Office of Legal Counsel.

6. INSTRUCTIONS. File after Section 605 of Volume II of the Compliance Manual. This document replaces the guidance on "American Companies Overseas, Their Subsidiaries and Foreign Companies," currently appended to Section 605 as Appendix M.

7. SUBJECT MATTER.

This enforcement guidance addresses two distinct issues: first, the circumstances in which American and American-controlled employers can be held liable for discrimination that occurs abroad; and second, the circumstances in which foreign employers can be held liable for discrimination that occurs within the United States. With regard to discrimination abroad, this guidance discusses Section 109 of the Civil Rights Act of 1991, which now governs the extraterritorial application of both Title VII and the Americans with Disabilities Act ("ADA").

Section I of the guidance sets forth standards for determining extraterritorial application, including how to assess the nationality of employers (Section I(B)(1)); how to determine whether a foreign entity is controlled by an American employer (Section I(B)(2)); and how to apply the Section 109 foreign laws defense (Section I(C)). Section II addresses coverage of foreign employers that discriminate in the United States. It focuses largely on the impact of any applicable international treaties on the application of Title VII and the ADA. Finally, Section III contains charge processing instructions to guide investigation of both categories of Title VII and ADA charges: those involving overseas discrimination and those brought against foreign employers acting within the United States.

This enforcement guidance replaces the Policy Guidance on "American Companies Overseas, Their Subsidiaries, and Foreign Companies," currently included in Volume II of the EEOC Compliance Manual as Appendix M to Section 605. In case of conflict, this guidance also supersedes Commission decisions addressing issues discussed herein.[1]

# I. DISCRIMINATION BY EMPLOYERS ABROAD

## A. Background

### 1. The Boureslan Decision

In 1991, the Supreme Court decided, in the companion cases of EEOC v. Arabian American Oil Co. and Boureslan v. Arabian American Oil Co., 499 U.S. 244, 111 S. Ct. 1227, 55 EPD ¶ 40,607 (1991) ("Boureslan"), that Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., did not apply

extraterritorially to regulate the employment practices of United States employers that discriminate against United States citizens abroad. In Boureslan, a naturalized United States citizen alleged that he had been harassed and ultimately dismissed, on the bases of his race, religion, and national origin, in Saudi Arabia. Boureslan's Title VII suit was brought against his employers, two Delaware corporations with their principal places of business in, respectively, Texas and Saudi Arabia.

The Supreme Court rejected Boureslan's claims, holding that Title VII did not extend to United States citizens employed abroad by American employers. Relying on the "long-standing principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States,'" 111 S. Ct. at 1230 (citations omitted), the Court found the language of Title VII insufficient to overcome the presumption that the statute was not intended to apply extraterritorially. In so holding, the Court rejected arguments made by the Commission to support the exercise of extraterritorial jurisdiction; it noted, however, that Congress was free to amend Title VII to explicitly provide for overseas coverage if it chose to do so. Id. at 1236.

### 2. Section 109 of the Civil Rights Act of 1991

In response to the Boureslan decision, Congress included Section 109 in the Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (1991). Section 109 amends both Title VII and the Americans with Disabilities Act, 42 U. S. C. §§ 12101 et seq. ("ADA"), to:

- add that the definition of "employee" includes, "[w]ith respect to employment in a foreign country . . . an individual who is a citizen of the United States," see Section 109(a), amending Section 701(f) of Title VII and Section 101(4) of the ADA;[2]

- provide that discrimination against U.S. citizens abroad will be covered if engaged in by an American employer or by a foreign corporation controlled by an American employer, see Title VII, new Section 702 (c) (1); ADA, new section 102 (c) (2) (A);

- make clear that neither Title VII nor the ADA will apply "to the foreign operations of an employer that is a foreign person not controlled by an American employer," see Title VII, new Section 702 (c) (2); ADA new Section 102(c)(2)(B);

- identify factors to be considered in determining whether an American employer controls a foreign corporation, including the interrelation of operations, common management, centralized control of labor relations, and common ownership or financial control of the two entities, see Title VII, new Section 702(c)(3); ADA new Section 102(c)(2)(C); and

- provide a defense for violations of Title VII or the ADA if compliance with those statutes, "with respect to an employee in a workplace in a foreign country," would "cause" a covered entity to "violate the law of the foreign country in which such workplace is located," see Title VII, new Section 702(b); ADA, new Section 102(c)(1).[3]

The legislative history of the Civil Rights Act makes clear that the purpose of Section 109 was to respond to the Boureslan decision. Section 109 was intended to "extend the protections of [T]itle [VII] and the [ADA] to American citizens working overseas for American employers," 136 Cong. Rec. S15,235 (daily ed. Oct. 25, 1991) (statement of Sen. Kennedy), while at the same time ensuring that employers would not be "required to take actions otherwise prohibited by law in a foreign place of business." Id. at S15,477 (daily ed. Oct. 30, 1991) (statement of Sen. Dole). The language of Section 109 was modeled after the 1984 amendments to the Age Discrimination in Employment Act ("ADEA"), which were enacted to create extraterritorial jurisdiction under that statute. See 29 U.S.C. § 623(f),(h); 136 Cong. Rec. S15,235 (daily ed. Oct. 25, 1991) (statement of Sen. Kennedy); id. at S15,477 (daily ed. Oct. 30, 1991) (statement of Sen. Dole); 136 Cong. Rec. H9547 (daily ed. Nov. 7, 1991) (statement of Rep. Hyde). The amendments made by Section 109 are discussed in further detail below.

### B. Employers Covered Under Section 109 of the Civil Rights Act of 1991

#### 1. Assessing the Nationality of Employers

As noted previously, Section 109 covers discrimination abroad by American employers and by foreign corporations controlled by American employers. See Title VII, new Section 702 (c) (1) and ADA, new Section 102 (c) (2)(A).[4] An initial question to be addressed in investigating charges of overseas discrimination, therefore, is whether the entity that allegedly discriminated -- or that controls the entity that allegedly discriminated -- is an American employer.

Neither Section 109 nor its legislative history sets forth an explicit test for determining the nationality of employers. As an initial matter, however, investigators should look to a company's place of incorporation in ascertaining an employer's nationality. See, e.g., Restatement (Third) of the Foreign Relations Law of the United States § 213 (1987) ("for purposes of international law, a corporation has the nationality of the state under the laws of which the corporation is organized"); id., Reporters' Note # 5 (general assumption under United States legislation is that place of incorporation determines corporate nationality). Where a respondent is incorporated in the United States, it will typically be deemed to be an American employer because an entity that chooses to enjoy the legal and other benefits of being incorporated here must also take on the concomitant obligations. In many cases, therefore, the nationality of an entity will be relatively easy to discern.

Nonetheless, it may sometimes be necessary to examine factors beyond (or in lieu of) the employer's place of incorporation. For example, other factors will have to be weighed to assess the nationality of those entities (such as law firms or accounting partnerships) that are "employers" or other covered entities within the meaning of Title VII or the ADA, but that are not incorporated companies. Moreover, where the discriminating entity is incorporated outside the United States but has numerous contacts here, investigators may need to review the totality of that company's contacts with the United States to make a nationality termination.

Potentially relevant factors for assessing an entity's nationality include, but are not limited to: (a) the company's principal place of business, i.e., the place where primary factories, offices, or other facilities are located; (b) the nationality of dominant shareholders and/or those holding voting control; and (c) the nationality and location of management, i.e., of the officers and directors of the company. In situations such as those described in the above paragraph, a company may be found to be American if these factors suggest a significant connection to the United States. The factors must be considered on a case-by-case basis, and no one factor is determinative; generally, the greater the number of factors that demonstrate an entity's connection to the United States, the more reasonable a conclusion that it is an American employer.[5]

> **Example:** Paperworks, Inc., is a 2000-employee corporation that is incorporated in the island of Bakeria. Paperworks' corporate headquarters is located in New York, its primary factories are located in Oregon and California, the vast majority of its employees work in the United States, and its three principal shareholders are U.S. citizens. Paperworks also maintains distribution facilities in Europe, and Charging Party, an American citizen working for the Paperworks office in London, alleges that he was discharged from that office on the basis of his race. Based on its places of business and the identity of its dominant shareholders, the Commission will most likely find Paperworks to be an American corporation despite the fact that it is incorporated outside the United States. The Commission would then be able to assert jurisdiction over Charging Party's claim of discrimination in London.

### 2. Assessing "Control" by an American Employer

Even if an entity is not itself American, its discriminatory conduct overseas will be covered if it is "controlled" by an American employer. As summarized in Section I(A)(2) above, Section 109 sets forth four factors to be considered in assessing whether such control exists. Those factors are: (a) the interrelation of operations; (b) the common management; (c) the centralized control of labor relations; and (d) the common ownership or financial control of the employer and the foreign corporation. See Title VII, new Section 702(c)(3); ADA, new Section 102(c)(2)(C).

The factors identified in Section 109 are the same as those relied upon by the Commission for determining when two or more entities (whether foreign or domestic) may be treated as an integrated enterprise or a single employer. See "Policy Statement on the concepts of integrated enterprise and joint employer," No. N-915 (June 6, 1987), incorporated into Volume II of the EEOC Compliance Manual as Appendix G to Section 605 ("Policy Statement on Integrated Enterprise"). The policy statement may thus be consulted for guidance in assessing whether, in the context of a particular charge alleging extraterritorial discrimination, a foreign entity is controlled by an American employer.[6] See also "Policy Guidance: Application of the Age Discrimination in Employment Act of 1967 (ADEA) and the Equal Pay Act of 1963 (EPA) to American firms overseas, their overseas subsidiaries, and foreign firms," No. N-915.039 (Mar. 3, 1989) at pp. 9-10 ("Policy Guidance on Overseas Application of the ADEA").

One case that discusses the integrated enterprise concept specifically in the context of a Title VII claim against a foreign subsidiary of an American parent is Lavrov v. NCR Corp., 600 F. Supp. 923, 37 EPD ¶ 35,401 (S.D. Ohio 1984). Relying on the four factors now incorporated into Section 109, the Lavrov court found that there was sufficient evidence of the possible interrelationship of the American parent and its foreign subsidiary to justify a trial on the question. The court first determined that the foreign entity, which was a wholly owned subsidiary of the American company, shared common ownership with it. Id., 600 F. Supp. at 928. The court treated as relevant evidence of the centralization of labor relations the facts that the American company instituted corporation-wide personnel policies; that certain personnel decisions with regard to individual employees required approval by the American company; and that the foreign subsidiary was not authorized to change any remuneration plans, benefits, or operating conditions without prior approval of its American parent. Id. The court also pointed to the American company's appointment of management members of the foreign subsidiary's board, and to the foreign company's function to market products assigned by the American company, as factors relevant to assessing, respectively, the commonality of management and the interrelationship of operations of the two companies. Id.; see also Commission's Policy Statement on Integrated Enterprise at pp. 3-5 (identifying relevant evidence).[7]

In discussing the evidence it found relevant, the Lavrov court also indicated that "'all four criteria [for assessing integrated status] need not be present in all cases'" and that "'the presence of any single factor in the Title VII context is not conclusive.'" 600 F. Supp. at 927 (citations omitted). See also Policy Statement on Integrated Enterprise at pp. 4-5; Policy Guidance on Overseas Application of the ADEA at p. 9. The determination of whether nominally separate entities are an integrated enterprise will depend on the facts of each case.

> **Example:** Charging Party (CP), an American citizen who is hearing impaired, alleges that he was discriminatorily terminated from his job in the country of Tangeria by Tangoods, a 200-person firm incorporated in Tangeria with offices only in that country. Tangoods was created by a 2000-employee American company, Amerigoods, to supervise international marketing of Amerigoods' products. Amerigoods owns 25% of the stock of Tangoods. Some of the members of Tangoods' board of directors are officers and/or board members of Amerigoods, but the two companies have distinct corporate forms, have entirely separate staffs, and perform all management and operational functions, e.g., payroll, hiring, and firing, independently. Amerigoods sets corporate policies, applicable to Tangoods, on such matters as acceptable employee behavior, employee sales quotas, amounts of annual and sick leave, salary scales, severance pay, and pension accrual and payout. Amerigoods representatives inspect the Tangoods facilities on numerous regularly scheduled visits each year, and dictate changes in marketing and sales strategy as necessary for continued sales of Amerigoods' products.
>
> Because it is incorporated and does business exclusively outside the United States, Tangoods is not itself an American employer. It may, however, be controlled by an American employer. Amerigoods is a partial owner of Tangoods. In addition, there is substantial interrelationship of operations between the two

companies; Tangoods exists and performs services principally for the benefit of Amerigoods, and Amerigoods representatives monitor and modify Tangoods' operations to maintain sales. Although personnel operations are handled separately and there does not appear to be much overlap in managerial personnel, Amerigoods does set uniform corporate policies on some matters related to labor relations. There is also some overlap in board membership between the two companies. Under such circumstances, the Commission would consider Tangoods to be "controlled" by Amerigoods, and would assert jurisdiction over CP's charge challenging his termination.[8]

Thus, if the alleged discrimination is perpetrated by an entity that is found to be American or to be controlled by an American employer, the Commission may assert jurisdiction over the charge and investigate the merits of the allegation. It is important to remember that this jurisdictional determination is to be made independently of any resolution of the merits of the underlying charge.

## C. The "Foreign Laws Defense" of Section 109 of the Civil Rights Act of 1991

Section 109 makes clear that "it shall not be unlawful," under either Title VII or the ADA, for an employer to take otherwise prohibited action if compliance with either statute, with respect to an employee in a workplace in a foreign country, would cause an employer to violate the law of the foreign country in which the workplace is located.[9] See Title VII, new Section 702(b); ADA, new Section 102(c)(1).

Under this provision, a respondent must prove three elements to establish a foreign laws defense: that (1) the action is taken with respect to an employee in a workplace in a foreign country, where (2) compliance with Title VII or the ADA would cause the respondent to violate the law of the foreign country, (3) in which the workplace is located. See generally, "Policy Guidance: Analysis of the sec. 4(f)(1) 'foreign laws' defense of the Age Discrimination in Employment Act of 1967," No. N-915.046 (Dec. 5, 1989) ("Policy Guidance on ADEA Foreign Laws Defense") (discussing identical defense available under ADEA). Each of the elements of the defense is discussed briefly below.[10]

### 1. Employee in a Foreign Workplace

To make out a foreign laws defense, an employer must first demonstrate that the challenged practice relates to an employee in a "workplace in a foreign country." Thus, the defense is unavailable under Title VII for employment practices that involve employees in any of the 50 States, the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, Guam, Wake Island, the Canal Zone, or the Outer Continental Shelf Lands as defined in the Outer Continental Shelf Lands Act. See Title VII, Section 701(i) (defining "State"); see also 29 C.F.R. § 1630.2 (d) (1992) (defining "State" for purposes of ADA jurisdiction).

### 2. Violate the Law of the Foreign Country

#### a. Existence of a Law

An employer must next prove that compliance with Title VII or the ADA would "cause" it to "violate the law of the foreign country." Under this prong of the defense, a respondent must initially demonstrate that the source of authority on which it relies constitutes a foreign "law." As noted in the Policy Guidance on the ADEA Foreign Laws Defense, the parameters of this element of the defense are uncertain. As a result, investigators should contact the Attorney of the Day whenever a question concerning a "law" arises. As further indicated in the Policy Guidance on the ADEA Foreign Laws Defense, however, there are circumstances in which the defense clearly would *not* be available. See Examples 2 and 3 at pp. 3-4 of ADEA Policy Guidance.[11]

The court in Mahoney v. RFE/RL, Inc., 818 F. Supp. 1, 60 EPD ¶ 41,959 (D.D.C. 1992), identified some such circumstances in a case involving the ADEA foreign laws defense. In Mahoney, the

defendant, an American employer, terminated plaintiffs, U.S. citizens working in Germany, based on a union contract that expressly required mandatory retirement at age 65. Defendant first claimed that the union contract, and the German labor practices it incorporated, were German "laws" that would be violated were defendant forced to comply with the ADEA. The court rejected this argument, holding that the defendant's union contract, although "legally binding," was not "law" for purposes of the ADEA foreign laws defense; the mandatory retirement provision had not been mandated by the German government and did not have general applicability beyond the parties to the contract. Id. at 3-4. Noting that "[t]he ADEA is a remedial statute and exceptions to it are to be construed narrowly," id. at 3, the court further held that foreign "[p]ractices and policies, even when embodied in contracts, are not 'laws'" for purposes of the defense. Id.

The court also refused to treat as foreign "law" German court decisions enforcing the union contract. As noted by the court, the German court decisions

> did not hold that anything in *German* law compelled the decisions reached . . . . If overseas employers could avoid application of the ADEA simply by embedding an age-discriminatory provision in a contract, having a foreign court enforce the contract, and calling the court's decision "law," then the Act's extraterritorial provisions would be largely nullified, for employers could easily contract around the law.

Id. at 5 (emphasis in original). Although decided under the ADEA and applicable therefore to charges arising under that statute, the reasoning of Mahoney is equally applicable to analysis of the foreign laws defense under Title VII and the ADA. See, e.g., Commission Decision No. 90-1, CCH Employment Practices Guide ¶ 6875 (customs and preferences of host country do not justify gender discrimination against United States citizens).[12]

### b. "Cause" a Violation

Under the second prong of the foreign laws defense, an employer must also demonstrate that compliance with Title VII or the ADA would "cause" it to violate foreign law, i.e., that it is impossible to comply with both sets of requirements. Investigators should attempt to obtain copies of all documentary material that might be relevant in assessing the requirements of the foreign law, including the text of the law itself, and any available legislative history or case law interpreting it. In addition, investigators should consider the steps a respondent has taken or could take to avoid the conflict and to comply with Title VII or the ADA. Compare Mahoney, 818 F. Supp. at 5 (rejecting defendant's claim that it had done all it could to comply with the ADEA where it had not fully pursued possibility of changing union contract or of mediating mandatory retirement issue), with Commission Decision No. 85-10, CCH Employment Practices Guide ¶ 6851 (respondent not liable for refusing to hire woman for work overseas where it provided "authoritative" evidence that foreign law restricted employment of women and demonstrated that it had taken all possible steps to process her application despite foreign restrictions). The defense will be established only where compliance with Title VII or the ADA will inevitably lead to a violation of foreign law. Cf. Kern v. Dynalectron Corp., 577 F. Supp. 1196, 33 EPD ¶ 34,194 (N.D. Tex. 1983) (employer had BFOQ defense for requiring helicopter pilots it employed in Saudi Arabia to convert to Moslem religion where Saudi Arabian law provided for beheading of non-Moslems who entered holy area), aff'd, 746 F.2d 810, 40 EPD ¶ 36,317 (5th Cir. 1984). Once again, investigators should contact the Attorney of the Day when questions arise about this element of the defense.

> **Example:** A Casparian statute requires that, after the period of their pregnancy-related disability, new mothers be given six weeks paid leave for childcare purposes. In compliance with the law, R, a United States employer employing teachers of English in Caspar, provides its female employees with such paid leave. Charging Party, a male U.S. citizen employed by R in Caspar, challenges R's failure to provide him the six weeks' childcare leave when his wife gave birth to their first child. R asserts a foreign law defense based on the Casparian statute.
>
> R's foreign law defense would fail under the above facts. Title VII requires that childcare leave be granted, equally to male and female employees. See "Policy

Guidance an Parental Leave," No. H-915-058 (Aug. 27, 1990). Requiring R to meet this Title VII obligation would not, however, "cause" a violation of -- or make it impossible for R to comply with -- Casparian law. Although R is required by Casparian law to give paid childcare leave to female employees, Casparian law does not forbid R from offering such leave to male employees as well. R can meet the requirements of both Casparian law and of Title VII by offering paid childcare leave to new parents in its employ, without regard to their sex.

### 3. Where the Workplace is Located

The final element of a successful foreign laws defense is proof that the foreign laws involved are those of the country in which the charging party's workplace is (or, absent the discrimination, would be) located.[13] The laws of the country in which an employer is headquartered or incorporated would not control for purposes of this element of the defense unless the charging party's workplace is also located in that country.

# II. DISCRIMINATION BY FOREIGN EMPLOYERS WITHIN THE UNITED STATES

It is well settled that, absent constraints imposed by treaty or by binding international agreement, Title VII applies to a foreign employer when it discriminates within the United States. See, e.g., Ward v. W & R Voortman, 685 F. Supp. 231, 233 (M.D. Ala. 1988) ("any company, foreign or domestic, that elects to do business in this country falls within Title VII's reach"); Commission Decision No. 84-2, CCH Employment Practices Guide ¶ 6840 (foreign company recruiting in United States was "employer" subject to Title VII for charge relating to recruitment). By employing individuals within the United States, a foreign employer invokes the benefits and protections of U.S. law. As a result, the employer should reasonably anticipate being subjected to the Title VII enforcement process should any charge of discrimination arise directly from the business the employer does in the United States. Commission Decision No. 84-2, supra.[14]

For the same reasons, the Commission takes the position that the ADA generally applies to foreign employers when the discrimination occurs within the United States. Nothing in the Supreme Court's Bourselan decision, or in the subsequent enactment of Section 109 of the Civil Rights Act of 1991, affects the Commission's resolution of this issue with regard to either Title VII or the ADA.

## A. Types of Agreements and Treaties that May Affect the Coverage of Title VII or the ADA

Although Title VII and the ADA may be generally applicable when a charge challenges discrimination by a foreign or foreign owned employer within the United States, such a respondent may allege that it is protected by the terms of a treaty or international agreement that limits the full applicability of U.S. anti-discrimination laws.[15] An agreement, e.g., a protocol

agreement, multinational convention, or treaty negotiated between the United States and another sovereign nation, confers special privileges or immunities on foreign firms or their operations in the United States and reciprocal rights on American corporations operating in the other nation. One type of agreement that may commonly be raised as the basis for a foreign employer's challenge to the Commission's authority is a commercial agreement between two countries called a friendship, commerce and navigation ("FCN") treaty. An FCN treaty grants jurisdiction to one country over another country's corporations. Under the terms of a typical FCN treaty, each signatory grants legal status to the other party's corporations so that those corporations can conduct business in the foreign country on a comparable basis with that country's domestic companies.

When an FCN treaty or other international agreement is raised as a defense to the Commission's application of Title VII or the ADA to a foreign employer operating within the United States,[16] the investigator should first confirm that the identified treaty in fact exists and should ask the respondent to produce a copy of the treaty. Copies of treaties can also usually be found at public

libraries, courthouses, or university libraries. Investigators should then, in conjunction with the Attorney of the Day as set forth below, determine: (1) whether the respondent is protected by the treaty; (2) if so, whether the employment practices at issue are covered by the treaty; and (3) if so, the impact of the treaty on the application of Title VII or the ADA. In general, the answer to each of these questions will depend on the language of the treaty and the intent of its signatories. As a general rule, when treaty interpretation issues arise, investigators should contact the Attorney of the Day so that (s)he can coordinate with the Department of State.

## B. Assessing Whether a Respondent is Protected by a Treaty

When a respondent invokes the protections of a treaty or agreement the first question is whether the respondent is covered by the specific treaty at issue. This inquiry depends in the first instance on the language of the treaty. "The clear import of treaty language controls unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.'" Sumitomo Shoji America, Inc., v. Avigliano, 457 U.S. 176, 180, 29 EPD ¶ 32,782 (1982) (citations omitted).

In Sumitomo, the Supreme Court held that the FCN treaty between the United States and Japan did not exempt wholly owned American subsidiaries of Japanese companies from Title VII. 457 U.S. at 183. According to the Supreme Court, the language of the treaty, confirmed by its negotiating history, compelled the conclusion that a company's place of incorporation would control the applicability of the treaty; thus, under Sumitomo only companies incorporated in Japan are entitled to the protection of the U.S./Japanese FCN treaty when they are charged with discriminating here. See also Commission Decision No. 86-2, CCH Employment Practices Guide ¶ 6860 (adopting Sumitomo). Except to the extent noted below, therefore, this treaty does not affect the applicability of Title VII or the ADA to Japanese-owned companies incorporated in the United States. Investigators may thus in most cases determine whether an entity is covered by the U.S./Japanese FCN treaty without contacting the Attorney of the Day.

It should be noted, however, that Sumitomo does not resolve all issues of treaty interpretation. First, the Supreme Court in Sumitomo was construing the language of a particular FCN treaty. The Court expressly reserved judgment on whether a similar interpretation would apply to FCN treaties between the United States and other countries, reasoning that other treaties, "although similarly worded, [might] have different negotiating histories." 457 U.S. at 185 n.12. The Sumitomo holding is thus expressly applicable only to those charges in which a Japanese- owned company relies on the U.S./Japanese FCN treaty. In other circumstances, investigators should contact the Attorney of the Day about the scope of coverage of any treaty at issue.

Second, the Seventh Circuit has stated that Sumitomo left open the question whether an American subsidiary might assert any of its parent's treaty rights where there was a contention that the parent had dictated the subsidiary's discriminatory conduct. Fortino v. Quasar Co., 950 F.2d 389, 393, 57 EPD ¶ 41,117 (7th Cir. 1991) (citing Sumitomo, 457 U.S. at 189-90 n.19). The Fortino court held that an American-incorporated subsidiary of a Japanese parent company may in such circumstances assert the FCN treaty rights of its parent, "at least to the extent necessary to prevent the treaty from being set at naught." 950 F.2d at 393. In Fortino, Quasar, a division of a U.S.-incorporated company owned by a Japanese corporation, discharged its American executives and gave preferential treatment to executives sent temporarily to the United States by the Japanese parent. According to the court, a judgment refusing to apply the U.S./Japanese FCN treaty and thereby "forbid[ding] Quasar to give preferential treatment to the expatriate executives that its parent sends would have the same effect on the parent as it would have if it ran directly against the parent; it would prevent [the parent] from sending its own executives to manage Quasar in preference to employing American citizens in these posts." Id.

The Commission disagrees with the result in Fortino and believes that permitting a U.S. subsidiary of a Japanese corporation to assert its parent's treaty rights enables that subsidiary "'to accomplish indirectly what it cannot accomplish directly [under the holding in Sumitomo].'" Spiess v. C. Itoh & Co. (America), Inc., 725 F.2d 970, 973, 33 EPD ¶ 34,213 (5th Cir.) (quoting unpublished order denying motion to dismiss), cert. denied, 469 U.S. 829, 35 EPD ¶ 34,663 (1984); cited in Brief of the

Equal Employment Opportunity Commission as *Amicus Curiae* in Support of Plaintiffs-Appellees, submitted in Fortino v. Quasar Co., Nos. 91-1123, 91-1197, 91-1564, at p. 5. As a result, in charges filed outside the Seventh Circuit, the Commission will continue to treat place of incorporation as determinative of the FCN treaty protection to which Japanese-owned companies are entitled. Field offices in the Seventh Circuit[17] are, however, bound by the Fortino decision. When charges alleging discrimination in the United States by Japanese-owned companies are filed in those offices, therefore, investigators should determine not only the respondent's place of incorporation, but whether, where an American subsidiary is involved, the discriminatory conduct was "dictated" by the Japanese parent.[18]

## C. Assessing Whether Employment Practices Are Covered by a Treaty

If a respondent is covered by a treaty, the next question to be addressed is whether the treaty applies to the employment practices challenged in the charge. As with issues of coverage discussed in Section II(B) above, the answer depends on the facts of the charge and on the language and intent of the specific treaty at issue.

> **Example:** The FCN treaty between the United States and the Republic of Xenon provides that
>
>> Companies of either Party shall be permitted to engage, within the territories of the other Party, accountants and other technical experts, executive personnel, attorneys, agents, and other specialists of their choice.
>
> Charging Party (CP) files a charge alleging that Xenocorp, a company incorporated in Xenon, denied him a clerical position in its word processing department in its Atlanta, Georgia office on the basis of his national origin and instead hired a Xenon national. Xenocorp argues that the FCN treaty permits it to employ its own nationals in its U.S. offices, and that its refusal to hire CP is therefore exempt from Title VII.
>
> Xenocorp seems unlikely to succeed with a defense based on the FCN treaty. Although Xenocorp, as a Xenon corporation, way well be covered by the treaty, the treaty's protection is limited to the selection of "accountants and other technical experts, executive personnel, attorneys, agents and other specialists." The treaty would not appear to shield Xenocorp from the application of Title VII to its hiring for CP's clerical position.

Compare MacNamara v. Korean Air Lines, 863 F.2d 1135, 1141-42, 49 EPD ¶ 38,756 (3d Cir. 1988) (discussing whether selected foreign national qualified as an "executive" under terms of FCN treaty), cert. denied, 493 U.S. 944, 51 EPD ¶ 39,439 (1989).

In assessing whether treaty protection is available, investigators should look first to the job as to which discrimination is alleged to have occurred. A job title or label may not be determinative; investigators should identify actual job functions and the charging party's relationship to others of the respondent's employees. In addition, investigators should consider the relationship between the treaty and the action an employer is alleged to have taken. A treaty permitting an employer to "engage" certain personnel of its choice is, for example, probably applicable not only to a charge of discriminatory hiring but also to one of unlawful discharge. MacNamara, 863 F.2d at 1141-42 (right to "engage" executives under Korean FCN treaty includes right to terminate current personnel and replace them with executives who share defendant's nationality). However, such a treaty may be inapplicable if the charge challenges wage discrimination. But see Spiess v. C. Itoh & Co. (America), Inc., 643 F.2d 353 (5th Cir. 1981) (applying treaty right to "engage" executives to case challenging company's policy of restricting promotions and benefits to Japanese citizens), vacated on other grounds, 457 U.S. 1128 (1982). On the issue of applying FCN treaties to particular employment practices generally, see, e.g., Street, "Korean Air Lines: The Future Interpretation of "Executive" and "Engage" in Friendship, Commerce and Navigation Treaties," 14 Hastings Int'l & Comp. L. Rev. 93

(1990). Once again, any resolution of the applicability of treaty protections will depend on the facts of the charge and the particular treaty at issue.

### D. Assessing the Protection Granted by a Treaty

If a respondent can invoke treaty protections that cover the challenged employment practice, the final question to be addressed is the impact of the treaty on the application of Title VII or the ADA. Like other issues of coverage, this question ultimately depends on the language of the particular treaty at issue and on the intent of the treaty parties.

In general, FCN treaty provisions will control to the extent that they permit discriminatory conduct that would otherwise violate Title VII. See, e.g., Speiss, 643 F.2d at 356 ("unless federal civil rights laws reflect an affirmative disavowal of the rights provided by [a] Treaty, it is our duty to implement the treaty rights"); MacNamara, 863 F.2d at 1146 ("in the absence of evidence suggesting Congress intended subsequent legislation to affect existing treaty rights, and in the event the enactments conflict, the Treaty must prevail"). Even broadly worded treaties will not, however, "entitle a foreign company operating in the United States to select among American citizens on the basis of their age, race, sex, religion, or national origin." MacNamara, 863 F.2d at 1143; see also Wickes v. Olympic Airways, 745 F.2d 363, 365, 35 EPD ¶ 34,676 (6th Cir. 1984) (U.S./Greek FCN treaty "was intended to be a narrow privilege to employ Greek *citizens* for certain high level positions, not a wholesale immunity from compliance with labor laws prohibiting other forms of employment discrimination") (emphasis in original).

Most courts construing the scope of particular FCN treaties have further determined that the protection they extend is only the right of foreign companies covered by the treaty to prefer citizens of their own countries for executive, management, and other identified positions. See, e.g., Spiess, 643 F.2d at 359 (U.S./Japanese FCN treaty exempts covered companies "from domestic employment discrimination laws to the extent of permitting discrimination in favor of Japanese citizens in employment for executive and technical positions"); Wickes, supra, 745 F.2d at 365; MacNamara, 863 F.2d at 1140 (U.S./Korean FCN treaty intended to shelter foreign businesses from "any law . . . that would logically or pragmatically conflict with the right to select one's own nationals as managers *because of their citizenship*") (emphasis in original). Cf. Commission Decision No. 86-6, CCH Employment Practices Guide ¶ 6866 (international protocol did not immunize employer from any Title VII liability where it explicitly provided that foreign companies' rights would be exercised in accord with American employment laws).[19]

> Example: Tubu, Ltd., is a Tubistian company doing business in the United States. Under an FCN treaty between Tubistan and the United States, Tubistian companies operating in the United States are authorized to hire Tubistian citizens for executive positions. CP, a U.S. citizen of German origin, charges that he has been denied such a position in favor of a Venezuelan citizen. Tubu asserts the FCN treaty as a defense.

> Tubu's treaty defense is likely to fail because the treaty authorizes preferences only for Tubistian citizens. In this case, Tubu has preferred a Venezuelan citizen. While Tubu's conduct may ultimately be found not to violate Title VII, Tubu cannot rely on the treaty as a defense.

See Starrett v. Iberia Airlines, 756 F. Supp. 292, 295 (S.D. Tex. 1989).

Courts have also addressed the relationship between Title VII and a treaty that grants the right to prefer citizens. In MacNamara, for example, the Third Circuit determined that the U.S./Korean FCN treaty protected the right of a covered company to prefer its own citizens, but only *because of their citizenship.* As a result, the court held that the treaty barred disparate impact challenges against the Korean defendant that were based simply on the defendant's requirement that employees have Korean citizenship. In contrast, the court held that the treaty did not shield the foreign employer from disparate treatment claims alleging that the employer had intentionally preferred Korean citizens because of their race, sex, national origin, religion, or age. 863 F.2d at 1140-48; see also Brief of the

United States as *Amicus Curiae* on Petition and Cross-Petition for a Writ of Certiorari in Korean Air Lines v. MacNamara, Nos. 88-1449, 88-1551 (Sept. 1989) (approving Third Circuit's reasoning). Compare, e.g., Fortino v. Quasar Co., 950 F.2d at 393 (refusing to decide whether FCN treaty "confers a blanket immunity from Title VII" for claims of intentional discrimination on the basis of national origin), with Avigliano v. Sumitomo Shoji America, 638 F.2d 552, 559, 24 EPD ¶ 31,460 (2d Cir. 1981)(treaty does not insulate Japanese employer from Title VII, because Title VII, through the BFOQ defense, permits company to employ "Japanese nationals in positions where such employment is reasonably necessary to the successful operation of its business"), vacated on other grounds, 457 U.S. 176, 29 EPD ¶ 32,782 (1982), and Linskey v. Heidelberg Eastern, Inc., 470 F. Supp. 1181, 1186, 20 EPD ¶ 30,058 (E.D.N.Y. 1979) (U.S./Danish FCN treaty "was not intended to immunize foreigners from claims under the host country's employment discrimination laws"). When questions about the scope of treaty protections arise, investigators should contact the Attorney of the Day.

# III. CHARGE PROCESSING INSTRUCTIONS

Charges involving discrimination outside of the United States or discrimination by foreign companies inside the United States are very fact-specific. Defenses available to employers will vary with the particular facts of each case. The questions set forth below are offered as guidance for structuring an investigation. Investigators should bear in mind that these questions reflect the more detailed advice set forth above, and should consult the guidance as necessary for further information. Cross-references to the relevant sections of the guidance are included below.

The threshold question is whether the alleged discrimination occurred within or outside the United States.

## A. Discrimination Outside the United States

(1) Is the charging party a U. S. citizen? If not, (s)he is not protected by Title VII or the ADA, which exclude aliens working outside the United States. See Section I(A)(2), footnote 2.

(2) Is the respondent (alone or when joined with another entity with which it may be an integrated enterprise) a covered entity (e.g., does it have the requisite number of employees to be an "employer")? If not, the charge should be dismissed for lack of jurisdiction.

(3) Is the respondent American?

(a) Where is the company incorporated? See Section I(B)(1).

(b) If the respondent is not incorporated here, see Section I(B)(1) and ask also:

(i) Where are the company's principal places of business? Where are its employees and managers located?

(ii) What is the nationality of the owners, shareholders and management of the company?

(4) Alternatively, is the respondent controlled by an American employer or covered entity? See Section I(B)(2); see also Policy Statement on Integrated Enterprise.

(a) Do the American and the foreign company have interrelated operations? For example, does the foreign company exist exclusively to market the products/services produced by the American company? Do the companies share certain departments or functions? Do they have common policies?

(b) Do the American and the foreign company have common management? Do they have the same officers and/or directors?

(c) Do the American and the foreign company have centralized control of labor operations? For example, do they share a personnel department or apply the same

personnel policies? Do employees of both companies get the same benefits and leave? Does one person make employment decisions for both entities?

(d) Do the American and the foreign company have common ownership, e.g., have overlapping shareholders?

(e) Note that if the company responsible for the extraterritorial discrimination is neither American nor American-controlled, the conduct will not be covered by Title VII or the ADA. In evaluating American "control," no single factor is determinative.

(5) If the respondent is American or American-controlled, does it have a "foreign laws" defense for its conduct? See Section I(C).

(a) Does the challenged practice involve an employee in a foreign country? (The answer to this should be yes, since it is this fact that will have triggered the above analysis of charging party's citizenship and of respondent's nationality or control.)

(b) Is the source for the defense a "law" of the country in which the employee's workplace is or would be located? See Section I(C)(2)(a).

-- Does it involve merely a contract, a corporation's internal policies or regulations, or constraints that are the result of foreign customs or practices, but not laws? If so, the source is unlikely to be treated as a foreign "law."

(c) Would compliance with Title VII or the ADA cause the employer to violate that foreign law? See Section I(C)(2)(b).

(i) Do Title VII or the ADA "cause" a violation of the law? In other words, is compliance with both Title VII (or the ADA) and the foreign law impossible?

(ii) What steps has the employer taken to avoid the conflict? What actions, if any, are possible to meet both sets of obligations?

(d) Is the law that would be violated a law of the country in which charging party's workplace is or would be located?

(e) Note that the Attorney of the Day should be contacted if questions arise about the existence of a foreign law or the scope of the foreign laws defense.

## B. Discrimination by Foreign Employers Within the United States

(1) Is the respondent an employer or otherwise covered entity under Title VII or the ADA?

(a) Note that the charging party's status is irrelevant for jurisdictional purposes; Title VII and the ADA will cover conduct whether the charging party is a U.S. citizen or an alien.

(2) Is the respondent a foreign government or an entity owned by a foreign government? If so, it may be protected by the Foreign Sovereign Immunities Act ("FSIA"). Any FSIA protection would be lost, however, if the charge is based on a "commercial activity" such as the hiring of clerical staff. The Attorney of the Day should be contacted if a question concerning the FSIA arises. See Section II(A), footnote 15.

(3) Is there a treaty or other international agreement that protects the respondent from the full application of Title VII or the ADA? Note that the answer to this question will depend on the language of the specific treaty and the intent of its signatories. The Attorney of the Day should be contacted as noted below so that (s)he can coordinate with the Department of State.

(a) If a treaty is raised as a defense, does it in fact exist? A copy should be obtained.

(b) Is the respondent covered by the treaty? See Section II(B).

> (i) If the respondent relies on the U.S./Japanese FCN treaty, the treaty will generally apply only if the respondent is incorporated in Japan.
>
> -- In the 7th Circuit, however, the treaty will also be applicable even to American-incorporated respondents if there is a Japanese parent that dictated the discriminatory conduct.
>
> (ii) If the respondent relies on a different treaty, investigators should contact the Attorney of the Day before concluding whether treaty protection is available.

(c) If the respondent is in fact covered by the identified treaty, are the challenged employment practices also covered by it? See Section II (C).

> (i) Is the position for which charging party is applying among those named in the treaty?
>
> (ii) In addition, is the particular employment practice covered by the treaty? If the treaty applies only to hiring, for example, and the charging party is challenging discrimination in wages, it is possible that the respondent's actions may not be covered by the treaty.
>
> (iii) Again, investigators should contact the Attorney of the Day (regardless of the treaty involved) before concluding whether treaty protection is available.

(d) If the treaty does apply to the employment actions taken by the respondent, what impact does it have on the application of Title VII or the ADA? See Section II(D).

> (i) Has the respondent acted to benefit citizens of its own country? If not, treaty protection is most likely to be unavailable.
>
> (ii) Has the respondent acted to benefit citizens of its own country *because of their citizenship*? If the respondent has acted on grounds of race, sex, religion, national origin, or disability, its actions will not be protected by the treaty.
>
> (iii) Investigators should contact the Attorney of the Day when questions about the scope of applicable treaty protections arise.

# IV. CONCLUSION

Pursuant to Section 109 of the Civil Rights Act of 1991, Title VII and the ADA now cover discriminatory actions taken against U.S. citizens abroad by American or American-controlled employers. Jurisdiction over charges alleging extraterritorial discrimination thus depends on the status of both the charging party and the respondent. The charging party must be a U.S. citizen; the respondent must be an employer, or otherwise covered entity, and must be of American nationality or, if foreign, controlled by an employer of American nationality. Section 109 sets forth standards for determining control of a foreign corporation by an American employer and also identifies the requirements an employer must meet to establish a "foreign laws" defense.

Title VII and the ADA also cover discrimination by foreign companies within the United States, whether the charging party is a U.S. citizen or an alien. The extent of coverage in such situations is likely to depend on the existence of any treaties or international agreements between the United States and the home country of the foreign respondent.

Because of the potential sensitivity of issues involving relations between the United States and other countries, the Attorney of the Day should be consulted as questions arise about the scope of foreign laws or treaties or the appropriate handling of charges involving foreign policy concerns. The Attorney of the Day will then coordinate as necessary with the Department of State.

Oct. 20, 1993          _____/s/_____
Date                   Tony E. Gallegos
                       Chairman

1. Extraterritorial discrimination and coverage of foreign employers under the Age Discrimination in Employment Act ("ADEA") are addressed in two prior Commission guidances that remain Commission precedent for ADEA charges. See "Policy Guidance: Application of the Age Discrimination in Employment Act (ADEA) and the Equal Pay Act of 1963 (EPA) to American firms overseas, their overseas subsidiaries, and foreign firms," No. N-915.039 (Mar. 3, 1989); and "Policy Guidance: Analysis of the sec. 4(f)(1) 'foreign laws' defense of the Age Discrimination in Employment Act of 1967," No. N-915.046 (Dec. 5, 1989). In addition, investigators may wish to consult a compilation of articles prepared by the Commission's library on "Multinational Businesses: How Do U.S. Equal Employment Laws Apply?" for further information on extraterritorial discrimination and coverage of foreign employers under each of the statutes enforced by the Commission.

2. Section 109 preserves the exemption in Section 702 of Title VII for "employer[s] with respect to the employment of aliens outside any State." As a result, foreign nationals working abroad are not protected under Title VII whether they work for American or foreign employers. Title VII does generally cover aliens working inside the United States. See, e.g., Espinoza v. Farah Manufacturing Co., 414 U.S. 86, 95, 6 EPD ¶ 8944 (1973).

Although the ADA does not contain an explicit exemption for aliens abroad, it is the Commission's position, based on the language of new Section 101(4) covering U.S. citizens overseas, that the standards governing coverage of aliens are the same under both the ADA and Title VII.

3. Section 109 (c) further states that the amendments made by the section do not apply to pre-Act conduct. As a result, the Commission lacks jurisdiction over charges challenging discrimination that occurred overseas prior to the effective date of the Act, November 21, 1991. Such charges, whenever filed, should be dismissed unless the charge alleges an ongoing violation, in which case investigators should consult with their Regional Attorney.

4. Questions related to the nationality or "control" of a foreign entity will generally arise only in those charges alleging that discriminatory conduct has occurred abroad. Where discrimination occurs within the United States, it is the Commission's position that Title VII and the ADA will, absent treaty constraints, generally apply even to foreign employers not controlled by U.S. entities. See discussion in Section II, infra; compare Helm v. South African Airways, 44 FEP Cases 261, 267, 43 EPD ¶ 37,303 (S.D.N.Y. 1987) (ADEA exemption for foreign companies not controlled by American employers not applicable where discrimination occurred within the United States). In charges alleging discrimination inside the United States, therefore, questions of nationality will typically arise, if at all, only in assessing the applicability of specific treaty protections. See Section II, infra.

5. In making the nationality determination, investigators should bear in mind that any named respondent must also be an "employer," or an otherwise covered entity, under the relevant statute. For example, to be an "employer" under Title VII, an entity must be engaged in an industry affecting commerce and must employ 15 or more employees in each of twenty weeks in the current or preceding calendar year. Title VII, Section 701(a). The definition of "employer" under the ADA is similar, except that an entity must have 25 or more employees to be covered through July 26, 1994, and 15 or more employees thereafter. ADA, Section 101(5).

6. A foreign entity will be found to be controlled only if it is, in effect, an integrated enterprise with an American employer. For purposes of assessing control under Section 109, the portion of the policy statement addressing the concept of joint employers is irrelevant.

7. See also Mas Marques v. Digital Equipment Corp., 637 F.2d 24, 24 EPD ¶ 31,415 (1st Cir. 1980) (in

suit claiming extraterritorial discrimination on basis of national origin, finding wholly owned foreign subsidiary not integrated with American parent where only connection between two companies was that subsidiary purchased half its inventory from parent, and where each company had separate corporate structure, facilities, work force, business records, and personnel policies); compare Chaiffetz y. Robertson Research Holding, Ltd., 798 F.2d 731, 735, 41 EPD ¶ 36,525 (5th Cir. 1986) (in suit challenging discrimination within United States, adopting four-factor integrated enterprise test to assess whether a foreign parent and its American subsidiary were a single employer under Title VII); Linskey v. Heidelberg Eastern,# Inc., 470 F. Supp. 1181, 20 EPD ¶ 30,058 (E.D.N.Y. 1979) (same).

8. If it is determined that a foreign entity is in fact "controlled" by an American employer, investigators should consider naming both the U.S. and the foreign companies if warranted by the facts of the charge. See Policy Guidance on Overseas Application of the ADEA at p. 9 (failure of foreign firm controlled by an American employer to comply with ADEA "could result in liability for *both* the controlling firm and its subsidiary") (emphasis in original); compare Lavrov, 600 F. Supp. at 931-32 (finding Title VII inapplicable to foreign corporations, but prior to 1991 amendment). In cases in which a foreign entity is named directly, it must be an "employer" or an otherwise covered entity under the relevant statute.

It should be noted that attempts to apply Title VII or the ADA to foreign, as well as American, employers -- at least when the discrimination occurred abroad -- may raise questions about the Commission's personal jurisdiction over the foreign company, i.e., about the Commission's ability, independent of whether the company is a covered entity under Title VII or the ADA, to subject the company to any Commission processes or to enforce its subpoenas in court. See, e.g., Lavrov, 600 F. Supp. at 930; Mas Marques v. Digital Equipment Corp., 637 F.2d 24, 28, 24 EPD y 31,415 (1st Cir. 1980) (refusing to exercise personal jurisdiction over foreign subsidiary of American company). As a general rule, due process requires that an employer have minimum contacts with the United States before such jurisdiction may be asserted. See,e.g., Commission Decision No. 85-16, CCH Employment Practices Guide ¶ 6857 (even if respondent is a Title VII employer, due process requires minimum contacts for it to be named in charge); Lavrov, 600 F. Supp. at 930 (noting cases holding that presence of American parent may occasionally be sufficient to assert personal jurisdiction over a subsidiary where the subsidiary is "a mere instrumentality" of the parent). These contacts must be assessed on a case-by-case basis. If questions arise about whether jurisdiction should be asserted over foreign employers in such charges, investigators should consult with their Regional Attorney.

9. Although the term "employer" is generally used for ease of reference, Section 109 provides a foreign laws defense for all entities covered under Title VII and the ADA, including employment agencies, labor organizations, and foreign corporations controlled by American employers. It should also be noted that, independent of the defense provided by Section 109, respondents may assert in some cases that obligations imposed by international treaty dictated their discriminatory conduct abroad. See, e.g., Commission Decision No. 90-1, CCH Employment Practices Guide ¶ 6875 (rejecting respondent's claim that treaties and foreign law mandated discriminatory treatment of charging parties in Turkey). Investigators should contact the Attorney of. the Day when a treaty-based defense is raised in charges alleging extraterritorial discrimination. (S)he will then contact the Department of State.

10. As is typically true of statutory defenses or exemptions, it is the employer's burden to prove that the foreign laws defense is applicable and that the standards of the defense are satisfied. Cf., International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, UAW v. Johnson Controls, 499 U.S. 187, 111 S. Ct. 1196, 1204, 55 EPD ¶ 40,605 (1991) (fetal protection policy violates Title VII unless employer can prove that sex is a *bona fide* occupational qualification); EEOC Compliance Manual, Vol. II, Section 625.4 (b). This is the Commission's position on the identical defense under the ADEA. See Policy Guidance on ADEA Foreign Laws Defense at pp. 3, 6, 7 (referring to proof burdens on an employer); see also Mahoney v. RFE/RL, Inc., 818 F. Supp. 1, 60 EPD ¶ 41,959 (D.D.C. 1992) (without discussion, assigning burden of proving an ADEA foreign laws defense to employer). An employer operating in a foreign country has the best information about the existence of any applicable foreign law, the constraints on its operations that the law imposes, and the alternatives available to it in complying with the requirements both of that foreign law and of Title VII or the ADA. As a result, it is appropriate for the employer to demonstrate that all elements

of a foreign laws defense are met.

11. Example 2 of the Policy Guidance on the ADEA Foreign Laws Defense makes clear that an entity's corporate charter will not be treated as a foreign law simply because the charter is registered with a foreign government agency. Example 3 of that guidance indicates that a bill passed by one house of a foreign legislature will not be regarded as a foreign law if the Constitution of the foreign country requires that a bill be passed by both houses of the legislature before being given the force and effect of law within the country.

12. Cf. also Abrams v. Baylor College of Medicine, 581 F. Supp. 1570, 1576, 1577, 34 EPD ¶ 34,303 (S.D. Tex. 1984) (finding violation of Title VII where employer rejected Jewish applicants for rotation program in Saudi Arabia based merely on informal conversations with Saudi officials; "various gleaned impressions to the effect that the Saudis did not want any Jews in their country;" and a "paternalistic 'concern' for the safety of Jews traveling to Arab lands"), aff'd in relevant part, 805 F. 2d 528, 41 EPD ¶ 36,682 (5th Cir. 1986); Fernandez v. Wynn Oil Co., 653 F.2d 1273, 1276-77, 26 EPD ¶ 32,060 (9th Cir. 1981) (stereotypes that South American clients would refuse to deal with female executive insufficient to provide BFOQ for sex discrimination in denying job to woman in United States).

13. The laws of the country in which the workplace would, absent the discrimination, have been located may be relevant in cases alleging, for example, that an American employer with offices in Country X has refused to transfer a female employee in that country to its offices in Country Y because of Country Y's statutory restrictions on the employment of women. Because the charging party in such a case would have had a workplace in Country Y, it is that country's laws that would be relevant for purposes of the foreign laws defense, even though the charging party's then current workplace is elsewhere. Cf. Commission Decision No. 85-10, CCH Employment Practices Guide ¶ 6851 (finding that respondent had articulated a legitimate, nondiscriminatory reason for failure to hire female charging party in U.S. for job in foreign country where that country would not approve charging party's application for employment or issue her a work permit).

14. Personal jurisdiction over a foreign employer will not typically be in question in charges which allege that the foreign employer does business within the United States and that the discrimination arises from that business. See Commission Decision No. 84-2, supra (asserting jurisdiction over foreign respondent that recruited applicants in the United States in charge alleging discrimination in the recruitment process). Of course, any foreign respondent must be a covered entity under either Title VII or the ADA, as relevant. Id. (foreign respondent was an "employer" engaged in commerce under Title VII based on its recruitment activities in the United States).

15. If the respondent is a foreign state, or an agency or instrumentality of a foreign government, it might also claim to be insulated from Title VII and the ADA by the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 et seq. ("FSIA") (1988 & Supp. III 1991). The question whether a company is an agency or instrumentality of a "foreign state" under the FSIA may depend, in part, on the extent to which the company is owned by a foreign government. See 28 U.S.C. § 1603(b); see also Commission Decision No. 85-11, CCH Employment Practices Guide ¶ 6852 (educational and cultural exchange center was a "foreign state" because fully funded by foreign government). Even if an employer is a "foreign state," however, it is not immune from suits based, among other things, on "a commercial activity carried on in the United States." 28 U.S.C. § 1605(a)(2). The legislative history of the FSIA states that "activities such as a foreign government's . . . employment or engagement of laborers, clerical staff or public relations or marketing agents" are considered commercial, as is "the employment of American citizens or third country nationals by the foreign state in the United States." H.R. Rep. No. 1487, 94th Cong., 2d Sess. 16, reprinted in 1976 U.S. Code Cong. & Ad. News 6604, 6615. See also Commission Decision No. 85-11, supra (discussing scope of "commercial activity" exemption from immunity and noting that governmental purpose of activity does not assure immunity). Investigators should contact the Attorney of the Day if questions concerning the FSIA arise.

16. As noted in note 9, supra, the provisions of a treaty might also be raised as a defense to a charge that an American or American-controlled entity has engaged in extraterritorial discrimination.

Investigators should contact the Attorney of the Day in such circumstances.

17. The Seventh Circuit sets governing precedent for courts located in Illinois, Wisconsin, and Indiana.

18. As noted in text previously, Sumitomo and Fortino interpreted only the U.S./Japanese FCN treaty. As a result, the Commission will consult with the Department of State on whether place of incorporation is the controlling factor in assessing the coverage of other FCN treaties, or on the treaty rights of U.S. subsidiaries owned by non-Japanese foreign corporations. As noted previously, therefore, the Attorney of the Day should be contacted whenever the provisions of other FCN treaties are asserted as a defense.

19. Rejecting the reasoning of Commission Decision No. 86-6, supra, the court in Lemnitzer v. Philippine Airlines, 783 F. Supp. 1238, 1243, 58 EPD ¶ 41,319 (N.D. Cal. 1991), read the terms of a U.S.-Philippine Air Transport Agreement ("ATA") to bar claims that a foreign employer's preference for Philippine citizens discriminated on the basis of age and national origin. The ATA provided that "the designated airline . . . may, in accordance with the laws and regulations of the other Party relating to entry, residence and employment, bring in and maintain in the territory of the other Party managerial, sales, technical, operational and other specialist staff required for the provision of air transportation." The district court reasoned that the language exempted the airline from antidiscrimination laws for purposes of the referenced positions. The Commission disagrees with this ruling and concludes that treaties that permit an employer to bring in staff "in accordance with [U.S.] laws . . . relating to . . . employment," fully subject the employer to U.S. antidiscrimination laws. See Commission Decision No. 86-6, supra; Brief of the Equal Employment Opportunity Commission as Amicus Curiae in Lemnitzer v. Philippine Airlines, No. 92-17073 (9th Cir., filed April 28, 1993). Even if the language of the ATA could be analogized to that of FCN treaties like those at issue in MacNamara and Wickes, as discussed above, the Commission's position is that the right conferred by such treaties is only to prefer one's own citizens because of their citizenship, not to prefer people on bases prohibited by Title VII, the ADA or the ADEA. Ibid.

This page was last modified on April 24, 2003.

 Return to Home Page